UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BILLIE CASELLA, | ) |
| | ) |
|      Plaintiff | ) |
| | ) |
| v. | ) Civil No. 8-176-B-W |
| | ) |
| MBNA MARKETING SYSTEMS INC., and | ) |
| BANK OF AMERICA, CORP., | ) |
| | ) |
|      Defendants | ) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Billie Casella is suing her former employer claiming that she was the victim of unlawful sex stereotyping, having been informed, after she was not selected for a Customer Relationship Manager Program,  that she had to change her personality to be more motherly, soft, and kind, rather than aggressive, strong, and arrogant.  The defendants, MBNA Marketing Systems, Inc., and Bank of America, Corp, have moved for summary judgment.[1]  I recommend that the court deny the motion for summary judgment as to Casella's failure to promote claim and grant the motion with respect to Casella's constructive discharge claim.[2]

## I.    SUMMARY JUDGMENT PRINCIPLES

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   "In the lexicon of Rule 56, 'genuine' connotes that the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving

---

[1]    The defendants indicated that Bank of America, Corp. is "incorrectly identified.  (Mot. Summ. J. at 1.)  For ease of discussion I use the term "defendants" or "the Bank" in this recommended decision.

[2]    As I note below, Casella's amended complaint does not actually include a constructive discharge claim but she does attempt to defend such a claim in her response to the motion for summary judgment.

party, and 'material' connotes that a contested fact has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (quoting United States v. One Parcel of Real Property (Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir.1992)).  I "draw the relevant facts from the summary judgment record and rehearse them in the light most flattering to" Casella.  Bergeron v. Cabral, 560 F.3d 1, 4 (1st Cir. 2009) (citing Cox v. Hainey, 391 F.3d 25, 27 (1st Cir.2004)).

A Panel of the First Circuit Court of Appeals recently issued a decision of significant importance to trial courts addressing employment claims of this ilk and it must be incorporated into the summary judgment standard for this case. In Chadwick v. Wellpoint, Inc., 561 F.3d  38 (1st Cir. 2009) the First Circuit rejected, with respect to  a Title VII employment discrimination case, the suggestion that a plaintiff must have explicit evidence to survive summary judgment. 561 F.3d at 46.  This onus, the Panel opined "would undermine the concept of proof by circumstantial evidence, and would make it exceedingly difficult to prove most sex discrimination cases today." Id. (citing  Thomas v. Eastman Kodak Co., 183 F.3d 38,  58 n. 12 (1st Cir. 1999) for the proposition that the use of circumstantial proof of discrimination is all the more important because 'smoking gun' evidence is rarely found in the current sophisticated employment world).  The Panel noted "that circumstantial evidence is not necessarily less probative than direct evidence."  Id. at 46 n.9 (citing Desert Palace Inc. v. Costa, 539 U.S. 90,100 (2003)).[3]  And the Panel cautioned that "at summary judgment [the Court does] not decide which explanation for the non-promotion is most convincing, but only whether [the plaintiff] has

---

[3]        Even in the face of Chadwick, the defendants seem to insist that Casella must have direct evidence of discrimination.  (Reply Mem. at 4-7.)  The Chadwick discussion on this question embraces both mixed motive and direct discrimination claims. See 561 F.3d at 46.

presented sufficient evidence regarding [his or] her explanation." Id. at 47 n. 11 (citing Thomas, 183 F.3d at 61.)[4]

## II.   FACTS

### A.  The Bank Hires Billie Casella in November 2003 as a Customer Marketing Advisor

On November 3, 2003, Billie Casella began her employment with MBNA as a Customer Marketing Advisor, an entry level position, in Camden, Maine. (SMF ¶ 1; Resp. SMF ¶ 2; SAMF ¶ 1; Resp. SAMF ¶ 1.) Casella continued working for Bank of America following its acquisition of MBNA until she left her employment on February 8, 2006. (SMF ¶ 2; Resp. SMF ¶ 2; SAMF ¶ 1; Resp. SAMF ¶ 1.) Casella alleges that the Bank violated Title VII when it did not select her for a Customer Relationship Manager ("CRM") position in July 2005.  (SMF ¶ 3; Resp. SMF ¶ 3.)

---

[4]      One further note with regards to the summary judgment standard, both sides have not abided  by the letter of District of Maine's Local Rule 56 in their summary judgment pleadings.  With respect to Casella, subsection (c) of Local Rule 56 provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule.

Dist. Me. Loc. R. 56(c) (emphasis added).  Casella seems to read the "or" as an "and/or."  The defendants complain that her responsive statement of facts includes paragraphs at once admitting, qualifying, and denying.

> With respect to the defendants' reply statement of facts, subsection (d) of Local Rule 56 states:
> A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by subsection (f) of this rule. Each such reply statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation.

Dist. Me. Loc. R. 56 (c)(d) (emphasis added).  The first fifty-six plus pages of the defendants' reply statement of facts are committed to rebutting Casella's responsive statement of facts.  I have not considered these reply statements although I believe the defendants will find that my handling of the responsive statements accords with many of their proposed treatments.

With respect to the initial hiring of Casella, Department Manager Brian King interviewed Casella and was impressed with her confidence and determination to succeed even though she had no banking experience. (SMF ¶ 4; Resp. SMF ¶ 4.)  Initially, Casella was responsible for fielding calls from the Bank's credit card customers in a call center environment, assisting them with the activation of new accounts, selling products associated with the credit card, and performing balance transfers. (SMF ¶ 5; Resp. SMF ¶ 5.) Casella worked on teams of at least ten associates, supervised by a team manager. (SMF ¶ 6; Resp. SMF ¶ 6; Casella Dep. at 62.).

**B. Casella Receives Support from Her Supervisors and is Promoted with Significant Salary Increases**

The defendants assert that Casella's supervisors at the Bank, including males, were very supportive of her career and her advancement in the company.  (SMF ¶ 7; Casella Dep. at 66-67.) She testified: "I would say on the whole I never had a supervisor or manager at the bank that ever said I shouldn't get promoted or I shouldn't go after a job.  I was always very encouraged by my managers and peers." (SMF ¶ 7; Casella Dep. at  67: 1-10.)[5]

---

[5]     Casella responds by citing her declaration in which she states:

Most of the supervisors at MBNA who knew me, including males, were very supportive of my career and advancement within the company. However, this does not imply that all other supervisors, including other male supervisors, who did not know me were very supportive of my career and advancement. Both Chad Cunningham and Art Lenox were supervisors at MBNA whom I did not know until I interviewed with them and they were not supportive of me. My last manager, Alan Camire, was not particularly supportive of me; after I moved to his team, he told me I tried to do too much and should slow down and stay on the phone. He wrote a review I never received which, while positive, was less positive than my prior reviews

….

I determined in October 2005 based on the comments of Art Lenox, Brian King, Chad Cunningham, and Joyce McPhetres that the reason I had not been selected to the CRM Program was discriminatory. I told my primary care physician, Dr. McKim Peterson, that I had been crying for days because I felt MBNA had discriminated against me. I remained out of work from October 28, 2005 until Dr. Peterson released me to return to work on January 20, 2006 largely due to my reactions to and disbelief over MBNA's discriminatory action. During this period, a cousin also died in late December 2005 in a house fire, compounding my stress. I had an extremely difficult time returning to work in January 2006 following my medical leave due to the stress I experienced over my non-selection to the CRM Program. Upon my return to the Bank on January 20, and for the following three weeks, I felt as if I was being scrutinized by my managers, and I felt ashamed of my emotional breakdown. I experienced severe migraines, felt panicky, tearful and nauseous within minutes of entering the Bank of America building. On more than one occasion I was

In January 2004, MBNA promoted Casella to Customer Marketing Account Review Analyst. (SAMF ¶ 3; Resp. SAMF ¶ 3.) In April 2004, Casella was promoted and relocated to the Bank's call center in Belfast, Maine. (SMF ¶ 8; Resp. SMF ¶ 8.)   In October 2004 Casella was promoted to the Customer Assistance department. (SAMF ¶ 3; Resp. SAMF ¶ 3.)   In Belfast, Casella's career progressed and she received promotions to two other departments, Customer Marketing and Balance Retention. (SMF ¶ 9; Resp. SMF ¶ 9; SAMF ¶ 5; Resp. SAMF ¶ 5.) MBNA then appointed her to a special Customer Marketing Task Force from April to June 2005.  (SAMF ¶ 4; Resp. SAMF ¶ 4.)

In Casella's twenty-seven month tenure with the Bank, her annual salary increased 30.1%, from $24,000 to $32,159.48. (SMF ¶ 10; Resp. SMF ¶ 10; Casella Dep. at 46, 61; Sullivan Dep., Ex. 2; SAMF ¶ 7; Resp. SAMF ¶ 7.)  When she left her job on February 8, 2006, Casella's wages, including bonuses were $44,956.23. (SMF ¶ 11; Resp. SMF ¶ 11; SAMF ¶ 8; Resp. SAMF ¶ 8.)

Casella maintains that she started as an entry level Customer Marketing Advisor at MBNA's Camden, Maine location, then, as she describes it, "quickly rose through the ranks." (SAMF ¶ 2;  Casella Dep. at 60:14-61:10, 63:13-66:24; King Dep. at 84:16-25.)  Casella maintains that she was a superior performer, confident and assertive. (SAMF ¶ 6; Casella Dep. at 67:12-16; King Dep. at 18:23-25, 83:21-84:15; SMF ¶ 12; Resp. SMF ¶ 12[6].)

---

physically ill and vomited. I felt incredible stress and anxiety about returning to work where I had been rejected for the CRM position based on unfair gender stereotypes, where I had been spoken about by my managers in such pejorative terms, where I had had a public emotional breakdown, and when I felt that, no matter what I did, unless I changed my whole personality I would be unable to succeed at my job.

(Resp. SMF ¶ 7; Casella Decl. ¶¶ 2,15.)

[6]      Casella interjects that she testified that she was a superior performer, confident and assertive, not that she considered herself as such. (Resp. SMF ¶¶ 12.)  The only thing that Casella can represent by relying on her own characterization of her performance is how she considers herself.

The defendants respond that although Casella received some promotions to different departments, she remained an hourly employee and her cited deposition testimony does not support her statement that she "quickly rose through the ranks."  King testified only that her promotion within one department was "a good thing," but "not unusually quick." (Resp. SAMF ¶ 2; King Dep. 84:21-25.) King testified that Casella's work performance was average, but that she was goal driven.  (Resp. SAMF ¶ 6; King Dep. at 24:18-21.) As her 2005 performance evaluation demonstrates, her overall performance rating was "Exceeds Expectations," the second highest performance rating. A rating of "Significantly Exceeds Expectations" is the highest performance rating available. (Resp. SAMF ¶ 6; Casella Dep. Ex. 5; King Dep. Ex. 4; Lenox Dep. Ex. 18.)

There is no dispute that Casella concedes that she can "be very aggressive." (SMF ¶ 13; Resp. SMF ¶ 13.) Nor is there a disagreement that it was extremely important at the Bank for Casella to be able to work with her peers in a team environment. (SMF ¶ 14; Resp. SMF ¶ 14.)

### C. Casella's Female Supervisors Raise Concerns about Her Communication Skills and Her Approachability

Prior to June 27, 2005 --  the day Casella interviewed for the CRM position --  Karen Savage, Casella's direct supervisor in 2005, spoke to her about communication problems she had with a customer (SMF ¶ 16; Resp. SMF ¶ 16; Lenox Dep. Ex. 18)[7] and Tammy Wagonknecht and another supervisor spoke to her about being intimidating, her aggressiveness, and her approachability as an associate (SMF ¶ 15; Resp. SMF ¶ 15; Casella Dep. at 68-70, 74- 75). Specifically, after reviewing a tape recorded telephone call Casella had made to a customer, Savage sat her down and said that she had been aggressive. (SMF ¶ 17; Resp. SMF ¶ 17; Casella Dep. at 68.) Wagonknecht, informed Casella on the one occasion that she was too aggressive.

---

[7]      Exhibit 18 of the Lenox Deposition is the same as Exhibit 5 of the Casella Deposition and Exhibit 4 of the King Deposition.

(SMF ¶ 21; Resp. SMF ¶ 21; Casella Dep. at 64, 70.) As to this incident, Casella adds that she was joking around with someone at the time but that Wagonknecht perceived it differently. (Resp. SMF ¶ 21; Casella Dep. at 70:12-23.)

According to the defendants, Casella's performance appraisals "always" encouraged her to show more teamwork. (SMF ¶ 18; Casella Dep. at 69; Lenox Ex.18.) Savage noted in Casella's May 2005 performance appraisal that to be an effective leader she needed to demonstrate that she had a vested and sincere interest in helping others succeed. (SMF ¶ 19; Lenox Dep. at 160; id. Ex. 18.) In the same appraisal, under the category "Communication and Interpersonal Skills" Savage pointed out under "Opportunities for Improvement" that Casella needed to improve her communication with customers. (SMF ¶ 20; Casella Dep. at 74-75; Lenox Dep. at 162; id. Ex. 18.)

Casella responds that the April 2005 evaluation states that she "contributed to a fun and competitive team atmosphere."  While commenting that she exceeded expectations and should "continue to develop strong leadership skills" and "*perceptions* others have with regard to her ability," the appraisal indicates she could accomplish this by "demonstrating she has a vested and sincere interest in seeing others succeed." (Resp. SMF ¶¶ 18, 19; Lenox Dep. Ex. 18.)  Under the heading "Opportunities for Improvement," Savage referenced the conversation with the *single* customer which she previously had discussed with Casella and wrote:  "Although messages were left within compliance guidelines, Billie is encouraged to leave messages that give the customer the benefit of the doubt." (Resp. SMF ¶ 20; Casella Dep. at 74:10-75:5; Lenox Dep. at 162:20-23.)

**D. The CRM Program was Established in 2003 to Meet the Bank's Business Needs**

In 2003 MBNA established the CRM Program with the primary objective of providing coverage for peaks and valleys in call volume. (SMF ¶ 22; Resp. SMF ¶ 22; Lenox Dep. at 169.) CRM teams were formed in six regions across the country at the Bank's call centers, including in Ohio, Delaware, New Jersey, Maryland, Atlanta and Belfast. (SMF ¶ 23; Resp. SMF ¶ 23; SAMF ¶ 11; Resp. SAMF ¶ 11.)  Arthur Lenox was the Department Manager of the CRM Program, responsible for overseeing eleven section managers in each of the six offices that had CRM teams. (SMF ¶ 24; Resp. SMF ¶ 24.)  Lenox, located in Beachwood, Ohio, reported to Tom McAuliffe, who was the Director of the CRM Program. McAuliffe was located in Delaware. (SMF ¶ 25; Resp. SMF ¶ 25.)

In 2005 there were two CRM teams in Belfast, each with approximately fifteen CRM associates, supervised by a section manager. (SMF ¶ 26; Resp. SMF ¶ 26; King Dep. at 30.) Chad Cunningham was a section manager in the CRM Program from April 2004 through February 2006. (SMF ¶ 27; Resp. SMF ¶ 27.)

Per the defendants, the CRM Program was an 18-month program aimed at creating a "super rep" team of experienced and flexible associates who had the knowledge to provide coverage in MBNA's lines of business, including Customer Assistance, Customer Marketing, Customer Satisfaction, Credit Acquisition and Customer (Balance Retention). (SMF ¶ 28; Lenox Dep. at 52, 169; id. Ex. 4; Cunningham Dep. at 12-13; SAMF ¶ 10; Resp. SAMF ¶ 10.)   For example, if there was a high call volume because of a delinquency "bubble" the CRM team might work in Customer Assistance and then move to Credit Acquisition the following week. (SMF ¶ 29; Lenox Dep. at 53.) The Bank did not consider the CRM associates to be managers, nor was the program designed to train associates to become managers. (SMF ¶ 30; Lenox Dep. at

53, 172.)  Because of their knowledge and experience, CRM associates would occasionally cover

for a team leader for a short period of time while the manager was on leave. (SMF ¶ 31; Lenox

Dep. at 52-53, 55.) Associates selected for a CRM position would spend twelve to eighteen

months in the position, depending on the call center. (SMF ¶ 32; Lenox Dep. at 56; id. Ex. 4.)

The CRM associates who completed the program would return to a lateral position, a phone job

on the floor in a line of business. (SMF ¶ 33; Lenox Dep. at 69.)

Upon completion of the program, if a CRM associate sought a position at a higher salary

grade or a management level position, they would have to post (apply) for the position like any

other associate. (SMF ¶ 34; Lenox Dep. at 70.) CRM associates who were selected for the

program had previously demonstrated success in multiple lines of business and, like any other

senior level associate, the CRM associates that completed the program were generally good

candidates to become managers.  (SMF ¶ 35; Lenox Dep. at 119-120, 144.) Other than what was

required of all associates in each of the five lines of business, CRM associates did not receive

any additional training. (SMF ¶ 36; Resp. SMF ¶ 36.) While CRM associates frequently became

managers, there were no guarantees and some CRM associates who did not perform successfully

in the program did not become managers. (SMF ¶ 37; Resp. SMF ¶ 37; Casella Dep. at 186;

Lenox Dep. at 170-71; King Dep. at 33-34, 90.) Participation in the CRM Program was not the

exclusive way to become a manager, but rather one of many routes in which an associate could

gain experience in his or her desire to become a manager. (SMF ¶ 38; Lenox Dep. at 120, 122;

Casella Dep. at 165-66; King Dep. at 33.)

With respect to these assertions, Casella responds as follows. While the "purpose" of the

CRM Program may have been to create "super reps" who were experienced and flexible and

could provide coverage in MBNA's various lines of business, the CRM Program was a stepping

stone to management. (Resp. SMF ¶¶ 28,29, 30; Lenox Dep. 119:17-24; SAMF ¶ 19.) Having

the CRM experience was an advantage in obtaining a management position over employees

without such experience. (Resp. SMF ¶¶  28, 29, 30; King Dep. 33:25-35:1; Lenox Dep. 53:1-15;

Casella Decl. ¶16.) Casella believed that, although not the only way, the CRM Program was "the

way into management." (Resp. SMF ¶¶ 28, 29, 30; Casella Dep. 50:14-17.) Employees who

became CRM's ended up being well groomed to become managers, filled in for managers on

vacation, and frequently obtained management positions, often times before the scheduled

completion of the CRM Program. (Resp. SMF ¶ 28, 29, 30, 31; Lenox Dep. 53:1-15; Casella

Decl. ¶16.) The title for the position was "Customer Relations Manager." (Resp. SMF ¶ 30.)  She

admits that because of their knowledge and experience, employees in the CRM Program on

occasion filled in for managers who were on maternity leave, personal leave, or in meeting

(Resp. SMF ¶ 31; Casella Dep. 49:17-20), pointing out that Lenox testified CRMs may have the

opportunity to cover a team for a week. (Resp. SMF ¶ 31; Lenox Dep. 53:2-3.) While Lenox

believed the term of the CRM period might vary from call center to call center, the Belfast CRM

Program was scheduled to last 18 months. (Resp. SMF ¶ 32; Lenox Dep. Ex. 4.)

    With regards to prospect for advancement, Casella maintains that a number of employees

-- including Troy Crocker, Jerry McCook, Jose Gamboa, Jamie Brundrett, Marcus Smith,

Heather Treneer, Nathan Cotnoir, and Mark Foster --  became exempt managers before

scheduled completion of the CRM Program. (Resp. SMF ¶ 32; Casella Decl. ¶ 16.) While

admitting that employees selected for the CRM Program could return to a lateral posting or a

phone job on the floor, Casella stresses that at least nine of the twenty employees selected for the

CRM Program became exempt supervisors *before* the scheduled completion of the program and

did not return to phone jobs on the floor. Jerry McCook joined the CRM Program on July 30,

2005, and became an exempt MLO Unit Leader 1 on June 17, 2006; Jose Gamboa joined the CRM Program on July 16, 2005, and became an exempt Customer Service Sales Team Manager on May 6, 2006; and Marcus Smith and Nathan Cotnoir joined the CRM Program on July 30, 2005, and became Risk Operations Team Managers on May 6, 2006. (Resp. SMF ¶¶ 33, 34; Casella Decl. ¶ 16; Sullivan Dep. Exs. 6, 10, 12, and 21.)   Four other employees—Jamie Brundrett, Cassandra Rytky, Heather Treneer, and Mark Foster-- appear to have gone directly from the program to managerial positions after one year without returning to phone jobs. (Resp. SMF ¶¶ 33, 34; Sullivan Dep. Exs. 11,14, and 23) (showing Brundrett, Rytky, and Foster all became exempt Risk Operations Managers on July 29, 2006); Sullivan Dep. Ex. 17 (showing Treneer became an exempt Customer Service Team Manager on the same date). Finally, Troy Crocker became an exempt Risk Operations Team Manager on November 4, 2006. (Resp. SMF ¶ 33; Casella Decl. ¶ 16; Sullivan Dep. Ex. 4.)

Casella further stresses that not all of the employees selected necessarily had success in multiple lines of business; according to Lenox Dep. Ex. 4 "experience in minimally two MBNA Customer contact areas" was preferred but not required. Some employees had been in their second line of business for only several weeks when selected for the CRM Program. Marcus Smith and Kelly Fernald had only been in their second line of business – Retention – for several weeks when they were selected. (Resp. SMF ¶ 35; Sullivan Dep. Exs. 12, 20; Casella Decl. ¶ 16; SAMF ¶ 57; Resp. SAMF ¶ 57.)  Casella had experience not just in two, but in three MBNA contact areas: Marketing, Customer Assistance, and Retention. (SAMF ¶ 58; Casella Dep. at 114:6-117:5; Casella Dep. Ex. 11; Sullivan Dep. Ex. 2 at 10.)  A number of the selected male employees did not have as broad experience as Casella. (SAMF ¶ 59; Casella Dep. at 133:5-20.)The defendants respond that Casella's experience in Retention was limited, Casella having

11

been moved into that department on June 18, 2005. (Resp. SAMF ¶ 58; Sullivan Dep. Ex. 2 at 10; Casella Dep. at 48:1-12.)

Moreover, according to Casella, King testified that employees in the CRM Program who applied for management positions were *not* like other senior level associates but had an advantage. (Resp. SMF ¶ 35; King Dep. at 34:25-35:1.) Casella testified that in Maine completion of the CRM Program was the only direct route to a management position; while there may have been other ways to gain the necessary experience to become a manager, at the time she applied unsuccessfully for the CRM Program, the way to become a manager was to complete that program. (Resp. SMF ¶¶ 35, 36; Casella Dep. 165:1-19.)

**E. The Required and Desired Qualifications of a Candidate for the CRM Program**

According to the defendants, the CRM Program was extremely competitive and drew from highly qualified internal candidates. (SMF ¶ 39; Casella Dep. at 111; Lenox Dep. at 88.) Casella admits that the CRM Program was competitive and drew from highly qualified internal candidates. However, she contends, for male candidates, selection for the CRM Program for which Casella applied was not extremely competitive. Of the 14 male candidates who were interviewed, 10 were selected, or 71.43%, compared to 10 of the 19 female candidates, or 52.63%. (Resp. SMF ¶ 39;  Lenox Dep. Ex. 6.)

One of the many required qualifications for an employee seeking to apply to the CRM Program was an endorsement from the Director of their Department; in Casella's case this was her third level supervisor. (SMF ¶ 40; Resp. SMF ¶ 40; SAMF ¶ 21.) While many employees could inquire about the CRM Program, the candidate pool that was interviewed for CRM openings was limited by the required Director's endorsement. (SMF ¶ 41; Resp. SMF ¶ 41.) The

Director's endorsement did not guarantee that a candidate would be selected for the CRM Program. (SMF ¶ 42; Resp. SMF ¶ 42.)

The other required qualifications to be selected into the CRM Program included: Knowledge of MBNA credit card policies and procedures; ability to identify and elevate issues to management; ability to work effectively in a time sensitive environment; self motivation and results orientation; and strong verbal and written communication skills. (SMF ¶ 43; Resp. SMF ¶ 43; SAMF ¶ 21; Resp. SAMF ¶ 21.)   Casella adds that to be selected employees also could not have any schedule limitations; had to be flexible to change departments, job responsibilities, and hours; and had to have the ability to obtain lending authority. (Resp. SMF ¶ 43; Lenox Dep. Ex. 4; SAMF ¶ 23.)   CRM candidates were required to have strong communication skills. (SMF ¶ 44; Resp. SMF ¶ 44; Lenox Dep. at 62-63.)[8] In line with communication skills, it was a strength for CRM associates to be approachable.  (SMF ¶ 45; Resp. SMF ¶ 45; Lenox Dep. at 129, 145.) It was anticipated that participants in the CRM Program would be a role model for peers regarding customer relationship development, attitude,  and work ethic. (SMF ¶ 46; Resp. SMF ¶ 46.) Although not a required qualification, it was preferred that CRM candidates had experience in minimally two MBNA customer contact areas.  (SMF ¶ 47; Resp. SMF ¶ 47; SAMF ¶ 22; Resp. SAMF 22.)  In order to post, applicants also had to have the ability to become a certified representative in the business areas assigned within standard education time frames – being able to obtain lending authority is an example of a hurdle an applicant would have to achieve. (Resp. SAMF ¶ 23; Lenox Dep. at 59:19-60:2, Lenox Dep., Ex. 4.)

---

[8]     The defendants maintain that the communications skills were important "as they were responsible for sharing information with peers and managers in order to increase communication between divisions."  As Casella points out, the cited deposition testimony does not support this elaboration.

**F. Casella Receives Endorsement from Her Director and Support from Her Department Manager for Her CRM Application**

In June 2005, the Bank promoted Casella to a Retention Account Manager II, Grade 220 in Balance Retention.   (SMF ¶ 48; Resp. SMF ¶ 48.)  King, who became a Department Manager in Balance Retention, was involved in her promotion.  (SMF ¶ 49; Resp. SMF ¶ 49.) King was very supportive of Casella's career and from her very first day of work at the bank King had "done everything he could to try to help [her] to get [her] career where [she] wanted it to go." (SMF ¶ 50; Resp. SMF ¶ 50.)

The bank posted openings in the CRM Program in Belfast, Maine. (SMF ¶ 52; Resp. SMF ¶ 52; Lenox Dep. at 57, Ex. 4; Casella Dep. at 113-114.)  Casella initially learned of the CRM job opportunity through King and he very strongly encouraged her to apply.   (SMF ¶ 51; Resp. SMF ¶ 51; SAMF ¶ 12; Resp. SAMF ¶ 12.)   Currently a senior vice president at MBNA, in 2005 King was a department manager overseeing 5 managers and 60-75 employees. (SAMF ¶ 13; Resp. SAMF ¶ 13.)  Seeking to continue her growth and success within MBNA -- and harboring the ambition of obtaining a management position --  in the summer of 2005 Casella applied for the CRM Program. (SAMF ¶ 9; Casella Dep. at  110:10-19; Casella Dep. Ex. 11.)[9]

Because Casella had just started in Balance Retention, she received the required endorsement for the CRM Program from two Directors, Jeff Nathan and Susan Howland. (SMF ¶ 53; Resp. SMF ¶ 53; SAMF ¶ 24.)[10]   On June 13, 2005, two weeks after being promoted to Balance Retention, Casella completed and submitted an application for the CRM position that included information about her last two performance appraisals ("Excellent" on October 29,

---

[9]      The defendants note that there was no guarantee that a CRM would become a manager.  (Resp. SAMF ¶ 9.)
[10]      Casella adds that she was also endorsed by Brian King, her department manager.  (Resp. SMF ¶ 53; Casella Dep. at 111:23-25; SAMF ¶ 24.)  According to the defendants, King recalled that he would have supported Casella in her application to the CRM Program, but that as a department manager he would not have actually endorsed her application. (Resp. SAMF ¶ 24; King Dep. at 38:11-39:17.)  This factual dispute is not a deal maker or a deal breaker for either side.

2004, and "Exceeds Expectations" on April 28, 2005), her work experience at MBNA, her relevant work experience outside of MBNA and her education profile.  (SMF ¶ 54; Resp. SMF ¶ 54.)  Casella characterizes her application as "evidencing her success in multiple lines of business."  (SAMF ¶ 24.)

According to the defendants, because Casella was a Grade 220 in Balance Retention, and was already receiving a shift differential based on her work schedule, the CRM position (also a Grade 220) was a lateral transfer that would not increase her annual salary.  (SMF ¶ 55; Casella Dep. at 48-49; Cunningham Dep. at 47, 70; Resp. SAMF ¶ 15.) Nevertheless, Casella had a strong desire to become a manager at MBNA and she viewed participation in the CRM Program as the best path to reaching her goal. (SMF ¶ 56; Casella Dep. at 110.)

For her part, Casella admits that for purposes of pay, the CRM position was the same Grade 220 as her position in Balance Retention and would not have resulted in an immediate increase to her annual salary (SAMF ¶ 14; Resp. SMF ¶ 14) but she adds that all employees who were selected into the CRM Program received a raise on February 25, 2006 (Resp. SMF ¶ 55; Sullivan Dep. Exs. 4, 6-24).   Moreover, the position was not a "lateral transfer" insofar as the employees in the CRM Program often acted as managers covering for vacation, leaves of absence, and managers-in-meetings times as part of their duties filling in for managers. (Resp. SMF ¶ 55; Casella Dep. 49:17-24; SAMF ¶ 15.)  During vacations, leaves of absence, or meetings, CRMs assumed all the responsibilities of the managers for whom they were substituting, including administering monthly reviews. (SAMF ¶ 16; Casella Dep. 49:17-24.) The CRM position, unlike Casella's position in Balance Retention, was a stepping stone to management, and provided an advantage over candidates without such experience. (Resp. SMF ¶ 55; Lenox Dep. at 119:17-24; King Dep. at 34:25-35:1.) Casella admits that she had a strong

desire to become a manager at MBNA. However, she did not view participation in the CRM Program as the best path to reaching her goal; she viewed it as the *only* path and was unaware of any other path available to her to reach her goal. (Resp. SMF ¶ 56; Casella Dep. at 50:14-17, 110:10-17, 165:1-2; SAMF ¶ 20.)  Employees enrolled in the CRM Program ended up being well-groomed for and frequently obtained managerial positions, often times even before the scheduled completion of the 18-month program.  (SAMF ¶ 17; King Dep. at 33:25-34:4; Lenox Dep. at 53:1-15; Casella Decl. ¶ 16; Sullivan Dep. Exs. 4, 6, 10, 11, 12, 14, 17, 21, and 23.)[11] Employees with CRM experience had an advantage over employees without such experience in obtaining a management position.  (SAMF ¶ 18; King Dep. at 34:18-35:1.)

The defendants respond that CRMs were "super reps" who could cover various associate positions as the need arose. (Resp. SAMF ¶ 15; Lenox Dep. at 52:2-53:5; King Dep. at 29:13-30:17.)  The primary responsibility for the CRM analysts was to support the various departments/lines of business based on business needs, i.e., to provide support wherever it was needed based on ever-changing business needs. As a secondary function, CRM analysts *could* be asked to work on special projects or tasks, or manager coverage in *some* departments/lines of business in the event of a vacancy or an absence of the section manager. *Some* CRM analysts, because of their extra skill sets and knowledge, filled in for managers occasionally in absences providing manager coverage. (Resp. SAMF ¶ 17; Cunningham Dep. at 11:14-23; 15:15-16; 18:4-7.)  Not all employees in the CRM Program ended up being well-groomed for managerial positions, or obtained such positions. As Lenox testified, he would not say that the purpose of the program was to create individuals who were well-groomed to become managers. Rather, Lenox believed that happened based on the desire, flexibility, and personal drive of the individuals who applied to the program. (Resp. SAMF ¶ 17; Lenox Dep. at 53:6-15.)  Furthermore, many

---

[11]      (MBNA Bates Numbers 2425, 1951, 2258, 2065, 2555, 1611, 813, 2606, and 2589 respectively).

employees enrolled in the CRM Program did not obtain managerial positions. (Resp. SAMF ¶ 17; Sullivan Dep. Exs. 9, 13, 15, 16, 18, 22, 24.)  As King further testified, depending upon the individual's work history, experience level, background and/or education, an individual who had not been in the CRM Program could be chosen for a position over a candidate who had been in the CRM Program.  (Resp. SAMF ¶ 18; King Dep. at 90:8-22.)   The CRM position was only *one* of the stepping stones to a management position. As Lenox testified, any senior level associate position was a stepping stone to management. (Resp. SAMF ¶¶ 19, 20;  Lenox. Dep. at 119:23-120:3, 144:18-21.) Management positions were posted, and anyone who had the qualifications could post and could get the job.  (Resp. SAMF ¶¶ 19, 20; King Dep. at 35:5-10. ) As Casella herself testified, "[e]ventually anyone could become a manager." (Resp. SAMF ¶¶ 19, 20; Casella Dep. at 165:21.)

### G. The CRM Interview and Selection Process

The management team of McAuliffe, Lenox, Cunningham, and Mike Dallas, an Operations Manager for the CRM Program, conducted interviews for the CRM Program in Belfast, Maine on June 27 and 28, 2005.  (SMF ¶ 57; Resp, SMF ¶ 57; Lenox Dep. at 71-72, 99.)[12]  Two of the managers on the team would interview one candidate at a time on a rotating basis.  (SMF ¶ 58; Resp. SMF ¶ 58; Lenox Dep. at 95-96; SAMF ¶ 27; Resp. SAMF ¶ 27.)[13]  In order to ensure consistency in the interview process, a list of questions was created, but the interviewers would not strictly adhere to the list if, for example, information on a candidate's

---

[12]     Casella urges that the record citation does not support the contention that the dates of the interviews were June 27 and 28, 2005.   (Resp. SMF ¶ 57.)  She is correct but it escapes me how this advances her position.  "In addition," Casella asserts, "a fifth individual Crystal Trisch, may have interviewed one of the candidates, Jose Gamboa, although the date of his interview appears to have been in 2002, not 2005."  (Id.) But she cites "MBNA 235" and I am not going to scour the record in this case to locate that bates stamp.

[13]     Casella, in responding to the defendants' facts, admits that the interviews were done on a rotating basis; however, the record citation does not support the contention that two managers on a team necessarily interviewed one candidate, although it suggests this was how it was done. (Resp. SMF ¶ 58.) Oddly, Casella's own additional fact concedes the point.  (SAMF ¶ 27.)   Summary judgment is not an exercise in picking at nits.

performance appraisal would generate a question.  (SMF ¶ 59; Resp. SMF ¶ 59; Lenox Dep. at 93-95; id. Ex. 7.)[14]

There is no dispute that in terms of a gender ratio, the management team wanted the CRM Program to approximate the candidate pool posting for the program, while still selecting the best qualified candidates.  (SMF ¶ 60; Resp. SMF ¶ 60.)   Thirty-three internal candidates, nineteen females, including Casella, and fourteen males, met the required qualifications and were interviewed for the CRM Program. (SMF ¶ 61; Resp. SMF ¶ 61; Lenox Dep.  Ex. 6; SAMF ¶ 25; Resp. SAMF ¶ 25.)  Prior to the interviews, each department ranked the CRM candidates by department (see SAMF ¶ 53; Resp. SAMF ¶ 53; Cunningham Dep. at 33:11-20); however, Lenox testified:  "I would say that the ranking did not have a direct impact on the final decision. It didn't change the …interview score…."  (SMF ¶ 62; Resp. SMF ¶ 62;  Lenox Dep. at 80; Resp. SAMF ¶¶ 55, 56, 58, 59).   He testified that there was no particular weight given to that ranking.  (SMF ¶ 62; Lenox Dep. at 81; Resp. SAMF ¶¶ 55, 56.)   They were looking for the best qualified candidates.  (Resp. SAMF ¶¶ 55, 56, 59; Lenox Dep. at 84:16-21.) The interviewers also reviewed the candidates' last two performance appraisals to generate questions during the interviews.  (SMF ¶ 63; Resp. SMF ¶ 63;  Lenox Dep. at  81-82.)[15]

Because all of the CRM candidates who had been endorsed were top performers and deemed very well qualified (SAMF ¶ 26; Resp. SAMF ¶ 26), the interview score was the key to the "final selection." (SMF ¶ 64; Resp. SMF ¶ 64; Lenox Dep. at 87; SAMF ¶ 28; Resp. SAMF ¶ 28.)  That is, there is no dispute that the candidate's interview performance, their verbal and

---

[14]     Specifically, Casella admits that the interviews were done on a rotating basis; however, the record citation does not support the contention that two managers on a team necessarily interviewed one candidate, although it suggests this was how it was done. (Resp. SMF ¶ 59.)

[15]     Casella attempts to qualify this statement by indicating that Lenox testified that the performance rating may have generated questions. (Resp. SMF ¶ 63; Lenox Dep. at 81:22-82:1.)  My reading of the deposition is that there is a distinction between the performance appraisals and the rating.

communication skills, how they responded to questions and their ability to articulate, and their personality and demeanor, was the determining factor in the selection process. (SMF ¶ 65; Resp. SMF ¶ 65.)

Lenox reports that during the interviews he was involved in each of the interviewers took separate notes, and sometimes listed strengths and weaknesses of the candidates.  (SMF ¶ 66; Lenox Dep. at 112-13; id. Exs. 10- 17.)   Each interviewer scored the candidates on a scale of 1 to 3 at the time of the interview. (SAMF ¶ 29; Resp. SAMF ¶ 29.)   A "1" purportedly meant the candidate communicated effectively, demonstrated leadership skills, and "sold" him or herself effectively. (SAMF ¶ 30; Resp. SAMF ¶ 30.)

Immediately after the interview – if there was time  -- the two interviewers would discuss the interview, each give a score from a scale of "1" to "3" and then reconcile a final score. (SMF ¶ 67; Lenox Dep. at 98, 105-06;  id. Ex. 6; SAMF ¶ 31; Resp. SAMF ¶ 31.)  A candidate who scored a "1" did very well in the interview; the "1" candidate effectively communicated their experience at MBNA, demonstrated leadership skills, effectively communicated through the interview and responded to questions in a more global manner for MBNA and its customers, rather than just themselves.  (SMF ¶ 68; Lenox Dep. at 106-07.) A candidate who received a "3" was an individual that the interviewers believed was a good candidate but did not perform well in the interview.  (SMF ¶ 69; Lenox Dep. at 86-87.)  If there was not time, the discussion and reconciliation did not occur until the end of the two days when the four interviewers met together.  (SAMF ¶ 32; Resp. SAMF ¶ 32.)[16]

---

[16]    Casella responds that Lenox cannot testify about whether other interviewers followed the same practice of making notes during the interviews, particularly at those interviews in which he did not participate.  She points out that interview notes exist altogether for Melissa Bryant, Marcus Smith, Kelly Ferndel, Nathan Cotnoir and Mark Foster. Notes from only one interviewer exist for Jerry McCook, Jose Gamboa and James Brundrett, (Resp. SMF ¶ 66; Young Decl. ¶ 4; id. Ex. B.)  The interview notes for Jose Gamboa appear to be for another position entirely unrelated to the CRM position. (Resp. SMF ¶ 66; Young Decl. ¶ 5.)  Lenox testified that *if there was time after the interview and another candidate was not waiting to come in,* he and the other interviewer would discuss the

Lenox, Casella insists, is not competent to testify about what factors the other interviewers used to award a "1" score. Chad Cunningham testified that the interview score was a subjective score applied by or agreed upon by the two interviewers during the interview process, with a score of "1" being the strongest interview and "3" being the weakest. (Resp. SMF ¶ 68; Cunningham Dep. at 34: 4-7.) Lenox testified that a "3" meant the interviewer was someone they did not "feel that well" about. (Resp. SMF ¶ 69; Lenox Dep. 87: 2-3.)

There is no dispute that at the end of the two days of interviews, the management team discussed the candidate pool as a whole, the interviews, and the scores. (SMF ¶ 70; Resp. SMF ¶ 70.) While Lenox, Cunningham, and Dallas had input into the selection process through interview scores, McAuliffe had final decision making authority. (SMF ¶ 71; Resp. SMF ¶ 71; Lenox Dep. at 73.)

Casella stresses that the number of candidates to be selected for the CRM Program was not fixed. (SAMF ¶ 28; Lenox Dep. at 88:12-13; Cunningham Dep. at 44:3-45:12.)   The defendants respond that there was an overall budget to manage and the director, McAuliffe, had in mind that he was looking to hire an approximate number of associates to the team – somewhere in the 15 to 25 range. (Resp. SAMF ¶ 28; Cunningham Dep. at 28:8-9, 44:16-45:2.)

**H. Casella Interviews for the CRM Program**

Casella asked for and received support from her supervisors and these supervisors gave her mock interviews in preparation for the interview for the CRM position.   (SMF ¶ 72; Resp. SMF ¶ 72.) Casella interviewed with Lenox and Cunningham for the CRM position on June 27, 2005.  (SMF ¶ 73; Resp. SMF ¶ 73; SAMF ¶ 33; Resp. SAMF ¶ 33.)  Casella was admittedly nervous about the interview. (SMF ¶ 74; Resp. SMF ¶ 74.)  Prior to the interview, Casella had

---

interview and reconcile their scores if they were different. If there was not time, the discussion and reconciliation did not occur for those candidates whom Lenox interviewed until the end of the two days when all four interviewers met together.  (Resp. SMF ¶ 67; Lenox Dep. at 105:9-19.)

never met Lenox, who had traveled to Belfast to conduct the interviews.  (SMF ¶ 75; Resp. SMF ¶ 75; SAMF ¶ 34; Resp. SAMF ¶ 34.) Casella's only interaction with Lenox was during the interview, which lasted twenty to thirty minutes.  (SMF ¶ 76; Resp. SMF ¶ 76; SAMF ¶ 35; Resp. SAMF ¶ 35.)  Lenox, as a general rule, did not speak with a CRM candidate's managers and did not recall speaking with any of Casella's managers, including King. (SMF ¶ 77; Resp. SMF ¶ 77.)  King, other than supporting Casella, had no role in the CRM selection process and does not recall speaking with either Lenox or Cunningham before or after Casella's interview. (SMF ¶ 78; Resp. SMF ¶ 78.)

Other than CRM section manager Cunningham's encouragement to her to apply for the CRM Program, Casella had minimal interaction with him prior to her interview and never worked with him. (SMF ¶ 79; Resp. SMF ¶ 79.) Prior to the interview, Casella had spoken only briefly with Cunningham and then only regarding the CRM Program. (SAMF ¶ 34; Resp. SAMF ¶ 34.)  Cunningham had never said anything to Casella prior to the interview regarding her gender and she had no issues with him personally or professionally. (SMF ¶ 80; Resp. SMF ¶ 80.)

During the interview, Lenox and Cunningham both asked Casella questions about her experience, why she should be selected for the CRM Program, and what made her a better candidate.   (SMF ¶ 81; Resp. SMF ¶ 81.)   Casella did not believe that any of the questions that were asked during the interview were inappropriate. (SMF ¶ 82; Resp. SMF ¶ 82.)  At their depositions Cunningham and Lenox represented that they did not have any specific recollection of any of the CRM interviews.  (SMF ¶ 83; Resp. SMF ¶ 83.)  During the interview, Lenox did not state anything about her gender, or claim that as a female she was too aggressive. (SMF ¶ 90; Resp. SMF ¶ 90.)

21

Cunningham's notes for Casella's interview indicated under "Interaction Skills" (confidentiality, communicating with others, interpersonal interaction/teamwork and coping skills in a fast paced environment) that as a strength Casella provided "confident responses w/lots of detail."  (SMF ¶ 84; Resp. SMF ¶ 84; Cunningham Dep. at 55, id. Ex. 4; SAMF ¶ 39; Resp. SAMF ¶ 39.)[17]   However, Cunningham's sheet also notes as a weakness that Casella needed to "balance confidence with approachability."   (SMF ¶ 85; Cunningham Dep. at 55, id. Ex. 4; SAMF ¶ 39; Resp. SAMF ¶ 39.) [18]

Lenox interpreted Cunningham's comment to mean that, while Casella exhibited confidence, sometime during the course of the interview her "approachability" -- a strength for a CRM associate -- was questioned.  (SMF ¶ 86; Resp. SMF ¶ 86; Lenox Dep. at 129-30, 145.) While confidence was a positive attribute for a CRM candidate, Casella came across during the interview as unapproachable, and someone who would not be effective at working with her peers in a team environment.  (SMF ¶ 87;  Lenox Dep. at 129, 145; Cunningham Dep. at 69-70.)

There is no dispute that at the end of the interview, Casella asked Lenox and Cunningham a number of questions, including whether there was anything that would prevent her from being selected to the CRM Program. (SMF ¶ 88; Resp. SMF ¶ 88; SAMF ¶ 37; Resp. SAMF ¶ 37.) According to Casella, Lenox responded that she scared him, that she seemed to be very aggressive, and that she came off as very strong.  (SMF ¶ 89; Resp. SMF ¶ 89; SAMF ¶ 38; Resp. SAMF ¶ 38.)

---

[17]     Casella seems to intend to suggest that Cunningham did not write this comment by highlighting his testimony that he did not write "Candidate needs to balance confidence with approachability."  (Resp. SMF ¶ 84; Cunningham Dep. at 55.)

[18]     Casella points out Cunningham testified that he did not write a similar comment on the bottom of the second page of this note (Resp. SMF ¶ 85; Cunningham Dep. at 55:14-21.) Casella also faults this statement by indicating that Cunningham did not actually testify that he wrote this comment under weaknesses.  (Resp. SMF ¶ 85.)  However, there is little question that the comments on page one of the notes are in the same handwriting and there is no basis to believe the notations on the first page are not Cunningham's.  (See Cunningham Dep. Ex. 4 at 1.) I do not view the fact that someone else wrote the same comment on the second page raises any inference that the entire exhibit is somehow suspect.

There is no dispute that during the interview, Cunningham never said anything that made Casella feel discriminated against.  (SMF ¶ 91; Resp. SMF ¶ 91; Casella Dep. at 128-29.) Casella initially was confident that the interview went well (SMF ¶ 92; Resp. SMF ¶ 92; SAMF ¶ 36; Resp. SAMF ¶ 36) and left the interview without feeling that she was being discriminated against because of her gender (SMF ¶ 92; Resp. SMF ¶ 92; Casella Dep. at 126-27.)   Casella scored a "2" in the interview, which was in the middle of the "1" to "3" scale. (SMF ¶ 93; Resp. SMF ¶ 93 SAMF ¶ 40; Resp. SAMF ¶ 40.)  Her score of "2" placed her tied for 21-28 out of 33 candidates, or below the middle of the scale.   (Resp. SMF ¶ 93; Lenox Dep. Ex. 6.)[19]

## I.    Ratio of Males to Females Selected for the CRM Program

The management team's goal was to establish a CRM team with the number of associates that met the business needs of the Bank.  (SMF ¶ 94; Lenox Dep. at 64.)  During CRM postings in other regions, there were instances in which more CRM candidates might be selected than targeted if there were additional outstanding candidates. (SMF ¶ 95; Resp. SMF ¶ 95;  Lenox Dep. at 66-67.)   The female/male breakdown of interview scores for the CRM candidates was

---

[19]    Of course Casella denies that she came across in her interview as unapproachable and someone who would not be effective working with her peers in a team environment.  (Resp. SMF ¶ 87; Casella Decl. ¶ 4.)  Rather, she maintains, Lenox perceived Casella as "aggressive and [] it scared him" and Cunningham perceived her as "cocky" and "overly arrogant" like Cunningham, himself a man. (Resp. SMF ¶ 87; Casella Dep. at 125:20-126:25, 138:8-16.)  These facts are set forth in greater detail below.  It is Casella's contention that these attitudes were a product of gender stereotyping.

The defendants insist that Lenox does not recall giving Casella any feedback after her interview. Specifically, Lenox did not recall telling Casella that she scared him, or that she was aggressive. Further, Lenox testified that he would never give someone this type of feedback. Lenox testified he did not recall telling Casella she "came off very strong." Lenox would not say something like this to anyone without providing a specific example of how they were too strong. It would not help someone to just say "you came across strong."  (Resp. SAMF ¶ 38; Lenox Dep. at 135:3-136:6.)  This is the type of competing deposition testimony that does not break either way for one side or the other in the context of summary judgment but which, of course, can make or break a trial.

Also somewhat redundant of facts developed later on, Casella interjects that after speaking with her department manager, Brian King and Joyce McPhetres, the head of education and development and human resources for MBNA's northern region, she concluded that the comments made by Cunningham- that she was "cocky" and "overly arrogant," that she reminded him of himself, and his apparent written note that she needed to balance confidence with approachability -- reflected a gender bias.  (Resp. SMF ¶ 91; McPhetres Dep. at  22:3-24; Casella Dep. at 114:24-25; 138:7-140:16; Casella Decl. ¶5.)  She learned at the end of the interview before she left that Lenox felt she had been too aggressive and that she scared him. (Resp. SMF ¶ 92; Casella Dep. at 125:20-126.)  At the time of the interview, Casella did not believe that these comments were related to her gender. (Resp. SMF ¶ 92; Casella Dep. 127:3-5.)

female candidates to male candidates: "1" 5 -5; "1.5" 5 -5; "2" 6-2; "3" 2 -3.  (SMF ¶ 96; Lenox Dep. Exs. 6, 9.)

Casella responds that management team's goal was to establish a balanced CRM team approximately representative of the candidate pool which could meet MBNA's needs.  (Resp. SMF ¶ 94; Lenox Dep. at 84:3-21)(emphasis added).  Casella also points out that with respect to those candidates with an interview score of "2" the breakdown was 6 females to 2 males and with regards to those with an interview score of "3" the numbers were 3 females to 2 male candidates.  The three females who received a score of 3 are Eugena Gray, Peggy Helmstrom, and Marcia Thomas. The two males are Dave Haskell and Matt Alaimo. (Resp. SMF ¶ 96; Lenox Dep. Ex. 6.)

After meeting with the management team, McAuliffe based the final selections on the interview scores and twenty candidates that received an interview score of "1" or "1.5" were selected for the CRM Program. (SMF ¶ 97; Resp. SMF ¶ 97.)  The management team selected ten females and ten males for the CRM Program. (SMF ¶ 98; Resp. SMF ¶ 98.) Casella scored a "2" on her interview and she was not one of the candidates selected for the CRM Program. (SMF ¶ 99; Resp. SMF ¶ 99;  Casella Dep. at 129; Lenox Dep. at 88-89.)

According to Casella, selection for the CRM Program was markedly less competitive for males than for females. MBNA selected 20 employees for the program, 10 of 14 men, or 71.43%, compared to 10 of 19 women, or 52.63%.  (SAMF ¶ 52; Lenox Dep. Ex. 6; SAMF ¶ 97.)   In addition, of the 20 candidates accepted in the CRM Program, seven men and only two women were promoted to management positions before the completion of the Program. SAMF ¶ 97; Casella Decl. ¶ 16; Lenox Dep. Ex. 6.) [20] The applicants all had to meet the same job

---

[20]     The defendants insist that this "fact" lacks foundation as to the male versus female make-up of the entire workforce from which CRM candidates were selected. (Resp. SAMF ¶ 97.)   It could be that it was harder for males

requirements and all applicants underwent the same interview process. (Resp. SAMF ¶ 52;

Lenox Dep. at 97:20-22, Lenox Dep., Ex. 4; Resp. SAMF ¶ 98.)

Prior to the interviews, Casella was ranked 12th of 22 candidates from Retention.

(SAMF ¶54; Resp. SAMF ¶ 54.) All 11 candidates ranked higher than Casella were selected; in

addition, 5 of the 10 candidates ranked *lower* than Casella, including the 3 immediately below

her, as well as the nineteenth and twentieth candidates, were accepted. (SAMF ¶ 55; Lenox Dep.

Ex. 6.)  Three of the four males ranked lower than Casella in Retention were chosen.  (SAMF ¶

56; Lenox Dep. Ex. 6.)  Casella, relying on her own declaration, represents that five of the ten

males selected -- Marcus Smith, Jerry McCook, Jose Gamboa, Mark Foster, and Bradley

Hopkins -- only had worked in two departments.  (SAMF ¶ 60; Casella Decl. ¶ 8.)[21]

---

to be selected for the CRM Program given the total number of males in the workforce. All this "fact" demonstrates is who was chosen from the candidates who were endorsed, and interviewed for the CRM Program. (Id.) Further, as evidenced in the documents produced during the Rule 30(b)(6) deposition of defendants, ten individuals were promoted to management positions before the completion of the CRM Program – seven males, three females and three additional individuals were promoted to management position shortly after completion of the CRM Program – all females-- and seven individuals have never been promoted to management positions – three males, four females. (Id.; Sullivan Dep. Exs. 4 - 24; Lenox Dep. Ex. 6.)

The defendants maintain that the assertion that the CRM Program was less competitive for males than females is not a fact, but is argument.  They also contend that the statement lacks foundation because it ignores the fact that in order to be interviewed, candidates needed to be selected through an endorsement process and there is no evidence as to the number of males versus females in the workforce. (Resp. SAMF ¶ 52; Casella Dep. at 51:16-24, 52:21-23; Resp. SAMF ¶ 97.)

[21]   The defendants request that this paragraph be stricken.  (Resp. SAMF ¶ 60.)   As part of this contention, the defendants note that Casella,

> admitted at her deposition that she did not know Mark Foster or Bradley Hopkins, and while she knew Jose Gamboa, Plaintiff admits she did not know his background. Casella Dep. at 135:23-136:4. Plaintiff admits she had only known Smith a few weeks, since they joined Retention at the same time. Plaintiff further admits she did not attend Smith's interview, nor did she have access to Smith's personnel records. Casella Dep. at 133:21-134:5. As to McCook, Plaintiff believed she had one more department than him, but admits McCook had better performance appraisals than she did, that he was outstanding and more qualified for the CRM position. Casella Dep. at 136:5-11. Plaintiff's declaration with respect to these CRM candidates should be stricken because it is not based on first hand knowledge, but rather Plaintiff's own beliefs and her interpretation of the Defendants' business records. Boulduc v. National Semiconducter Corp., 35 F. Supp. 2d 106, 110-11 n.4 (D. Me. 1998).

(Resp. SAMF ¶ 60.)

That said, the next paragraph of Casella's statement of additional facts is: Casella had taken more classes than at least Smith. (SAMF ¶ 61; Casella Dep. at 133:21-135:20.) And the following paragraph represents: Casella had more departments and classes than Shiree Farrar, a female selected to the CRM Program, and more departments than Karen Dalton, Melissa Bryant, Nicole Raye, Mary [sic] McNeil, Heather Treneer, and Kelly Fernald.(SAMF ¶ 62;  Casella Dep. 136:14-137:9; Casella Decl., ¶ 8.)

The defendants reiterate for the umpteenth time that the final decision was made based on the interview and they were looking for the best qualified candidates.  (Resp. SAMF ¶¶ 60, 61, 62; Lenox Dep. at 84, 88.)  Further, experience in a minimum of two departments is a preferred qualification, not a requirement. Additionally, having taken a certain number of classes is not a required qualification, nor is it even a preferred qualification. (Resp. SAMF ¶ 60;  Lenox Dep. Ex. 4.) They note that Casella admits that McCook had better performance appraisals than she did, was outstanding, and was more qualified for the CRM position. (Resp. SAMF ¶ 60; Casella Dep. at 136:5-11.) They further note that Casella testified that she had more classes than Shiree Farrar, however, Farrar began employment with MBNA 21 months prior to Casella. (Resp. SAMF ¶ 62; Sullivan Dep.  Exs. 2, 13; Casella Dep. at 18:23-24.)  In addition, Casella  testified that she was not more qualified than Melissa Bryant, Heather Treneer, and Macy Russell.  (Resp. SMF ¶ 62; Casella Dep. at 136:14-19, 137:13, 137:18-19.)

Casella states that one of the women selected, Heather Treneer, was the wife of an MBNA Manager. (SAMF¶ 98;  Casella Decl. ¶ 9.) Other than her speculation and belief, the defendants add, Casella has no evidence that being the wife of an MBNA manger played any role in the selection process. (Resp. SAMF ¶ 98.)  According to Casella, all of the female

---

The defendants respond with the following denial as to SAMF ¶ 61:

> There is no evidence in Plaintiff's citation to support her assertion that she had taken more classes than at least Smith. Casella Dep. at 133:21-135:20. In fact, Plaintiff admits she had only known Smith a few weeks, since they joined Retention at the same time. Plaintiff further admits she did not attend Smith's interview, nor did she have access to Smith's personnel records. Casella Dep. at 133:21-134:5. In any event, the final selections for the CRM Program were based solely on the interview. Lenox Dep. at 81:17-82:1, 87:4-9, 88:12-22.

(Resp. SAMF ¶ 61.)  Regarding SAMF ¶ 62, they ask that the statement be stricken:

> Plaintiff testified that she did not know Karen Dalton and did not know whether she was more qualified than Kelly (Flannery) Fernald. Casella Dep. at 136:20-21, 137:10-11. Plaintiff's declaration with respect to these female CRM candidates that she had no knowledge of should be stricken because her declaration is not based on first hand knowledge, but rather her interpretation of documents of the employees' work histories that she is not qualified to make. Boulduc v. National Semiconductor Corp., 35 F. Supp. 2d 106, 110-11 n.4 (D. Me. 1998).

(Resp. SAMF ¶ 62.)

candidates with whom she was familiar and who were selected fit the stereotype of being soft and non-aggressive. (SAMF ¶ 99; Casella Decl. ¶ 9.)[22]

It is the defendants' position that Casella was officially turned down for the CRM position based on her "Communication," defined, in part, as a candidate who did not demonstrate an ability to speak clearly and answer questions succinctly; they selected candidates who were able to more fully respond to questions.  (SMF ¶ 100; Lenox Dep. Ex. 11 (MBNA0219).) Casella was not considered for the CRM Program because, as noted by Cunningham during her interview, the "Candidate needs to balance confidence w/approachability."  (SMF ¶ 101; Lenox Dep. Ex. 11 (MBNA0219).)  (Needless to say) Casella did not attend the interviews of the other candidates, but felt that she was more qualified than three of the males who were selected based on her belief that she had experience working in more departments than them.  (SMF ¶ 102; Casella Dep. at 133-37; id. Ex. 2, ¶ 21.)

Casella insists that no "official" reason was ever provided to Casella why she was not selected for the CRM Program.  (Resp. SMF ¶ 100; Casella Decl. ¶6; SAMF ¶ 42; Resp. SAMF ¶ 42.)[23] Casella felt that she was more qualified than at least three males who were selected because, for instance, she thought that she had more experience working in more departments than they had. She also believed she was better qualified than at least one female who was selected, Shiree Farrar. (Resp. SMF ¶ 102; Casella Dep. at 133:5-12.) Casella did not know many of the other candidates who were selected. (Resp. SMF ¶ 102;  Casella Dep. at 133:5-137:22.)  In addition to their departments, Casella felt she was better qualified because she had

---

[22]    Somewhat ironically --given Casella's theory of this case -- the defendants maintain that this statement by Casella reflects "an inappropriate stereotype." (Resp. SAMF ¶ 99.)  With regards to the request that the paragraph be stricken, I do not do so, although the evidentiary strength of the statement is limited by the fact that this is only Casella's perception.

[23]    The defendants point out that Casella does not remember the specific conversation she had with Howland. (Resp. SAMF ¶ 42; Casella Dep. at 129:17-24.)

received multiple promotions in comparison, attended more classes, and had more experience. (Resp. SMF ¶ 102; Casella Dep. at 133:16-20.)[24]

### J. Casella Learns that She Was Not Selected and Talks with Cunningham and King

Casella was out of work on medical leave for knee surgery from June 28 to July 18, 2005. (SAMF ¶ 41; Resp. SAMF ¶ 21.) Sometime prior to July 18, 2005, Casella learned that she was not selected for the CRM Program from Director Howland, who encouraged Casella to apply again.  (SMF ¶ 103; Resp. SMF ¶ 103; SAMF ¶ 40; Resp. SAMF ¶ 40; SAMF ¶ 42; Resp. SAMF ¶ 42.)   Casella was disappointed that she was not selected because she had worked hard to align herself for the position.  (SMF ¶ 104; Resp. SMF ¶ 104.)  At this juncture, Casella did not believe that she was subjected to any discrimination, and never heard any gender related comments, until she had a conversation with King -  described below - after she learned she was not selected for the CRM Program.  (SMF ¶ 105; Resp. SMF ¶ 105; Casella Dep. at 46, 120, 131.)[25]

---

[24]     Subsequent to her deposition, Casella was furnished with the work histories of all of the candidates who were selected and has now determined that, contrary to her testimony, two of the males (Cotnoir and Crocker) also had experience in three areas. However, Casella now has learned that in addition to Smith, three males (McCook, Gamboa, and Foster) and six females (Dalton, Bryant, Raye, McNeil, Treneer, and Fernald) all had worked in only two departments compared to the three departments that Casella had worked in. (Resp. SMF ¶ 102; Casella Decl. ¶ 8.)

         With regards to Casella's dispute of this set of facts, she draws on conversations with key players that are set forth elsewhere in this summary of facts. She insists that when she questioned Chad Cunningham why she was not selected, he told her that she was "too cocky," "overly arrogant," that she should not be "so aggressive" and "strong" and that she reminded him of himself. (Resp. SMF ¶ 100; Casella Dep. at 138:8-139:11.)  Brian King told Casella that he had heard she was turned down because she was "cocky and arrogant and aggressive" and that she "needed to become more softer, more motherly; that if [she] was a man, it was acceptable, it's not acceptable out of a woman and that we need to address it."  (Resp. SMF ¶ 100; Casella Dep. at 141:7-13.)  In discussing why Casella was not selected for the CRM Program, Joyce McPhetres provided Casella with an overview of the evolution of women in business and told Casella that today "women are actually looked at as mothers, that they need to be a little softer, a little kinder…more motherly."  (Resp. SMF ¶ 100; Casella Decl. ¶ 6.)  After the interview, although Lenox did not tell Casella if she had been selected, he told her that she "scared him" and was "very aggressive" and "came on very strong." None of the individuals whom Casella spoke to about why she did not get selected said anything to her about "communication." (Resp. SMF ¶ 100; Casella Decl. ¶ 6.)  She insists that she *was* considered for the CRM Program but was not *selected* to the CRM Program because she did not conform to gender stereotypes. (Resp. SMF ¶ 101.)

[25]     Casella adds that Lenox told her following the interview that she "seemed to be very aggressive and that it scared him" and that she "came off very strong."  (Resp. SMF ¶ 105; Casella Dep. 125:25-126:25.)

According to Casella, a few weeks after learning that she was not selected for the CRM Program, Casella approached King and he informed her "off the record" that he was tired of hearing that she was cocky, arrogant,  and aggressive and she needed to learn to temper herself down. (SMF ¶ 106; Resp. SMF ¶ 106; Casella Dep. at 141, 143; SAMF ¶¶ 44, 43, 45.) King testified that he did not recall ever saying these things to Casella and he did not recall ever hearing anyone say Casella was "cocky" or "arrogant," nor did King think Casella  was "cocky" or "arrogant."  (Resp. SAMF ¶ 45; King Dep. at 60:17-61:8.)

Casella also maintains that King advised her that she needed to become softer, more motherly; her approach would be acceptable if she were a man, but it was not acceptable from a woman and they needed to address it. (SMF ¶ 107; Resp. SMF ¶ 107; SAMF ¶ 46; Resp. SMF ¶ 106.)  He also told her that "if you were a man, other managers felt that her behavior would be okay, but that because she was a woman she needed to be softer and motherly."  (Resp. SMF ¶ 106; Casella Dep. 142:19-23.)  The defendants respond that King testified, "I just don't think in those terms…"  (Resp. SAMF ¶ 46;  King Dep. at 61:16-24, 62:9-11.)  Furthermore, King testified he would never tell somebody they needed to be more motherly; he would not have said that to Casella, nor would he have told Casella she needed to be more soft.  (Resp. SAMF ¶ 46; King Dep. at 91:7-14.) King has no recollection of what he and Casella discussed after she was turned down for the CRM position, but King agrees he would have advised Casella with regard to her career goals. (Resp. SAMF ¶ 43; King Dep. at 58:2-12, 60:7-10, 61:25-62:4. ) He indicated that he would never say that his comments were "off the record."  (Resp. SAMF ¶ 44; King Dep. at 62:5-8.)

According to Casella, King also advised Casella that she should change mentors and find someone softer but still very successful. (SMF ¶ 108; Resp. SMF ¶ 108; SAMF ¶ 47.)  It was not

unusual for associates to change mentors to progress and develop on a career path and achieve their goals. (SMF ¶ 109; Resp. SMF ¶ 109.)  King suggested that Casella change from her mentor at the time, Tammy Wagonknecht to her sister-in-law, Kim Wagonknecht, a department manager at the time. (SMF ¶ 110; Resp. SMF ¶ 110; SAMF ¶ 48; Resp. SAMF ¶ 48.)   King suggested that Casella should learn to present herself in the way that Kim Wagonknecht did. (SAMF ¶ 49;  Casella Dep. at 40:7-16, 141:13-15, 143:15-144:25.)

King testified he may have suggested that Casella switch mentors, but he had no specific recollection of this.  (Resp. SAMF ¶ 47; King Dep. at 62:12-14, 63:1-7; Resp. SAMF ¶¶ 48, 49.) King opines that he would have suggested Kim Wagonknecht as a mentor for Casella because she was two or three levels above her and had internally climbed the ladder. (SMF ¶ 111; Resp. SMF ¶ 111; King Dep. at 65; Resp. SAMF ¶¶ 48, 49.)  King considered Kim Wagonknecht to be a good leader and very well respected; King respected her and thought she would be a good mentor to anyone. (Resp. SAMF ¶¶ 48, 49; King Dep. at 63:2-64:9.)  King contends that he considered Kim Wagonknecht a forward and direct person and not less assertive than Casella. (SMF ¶ 112; King Dep. at 65.)  The defendants deny that King told Casella to find a new mentor who was softer than her current mentor but still very successful. King did not think Kim Wagonknecht was "softer" than Casella – less direct or less assertive.  (Resp. SAMF ¶ 47; King Dep. at 64:10-18.)

Casella responds that King did not tell her to choose Kim Wagonknecht as a mentor because Kim was two or three levels above her and had internally climbed the ladder; rather, he told Casella that she should select Kim Wagonknecht as a mentor because she was "softer but very successful."  (Resp. SMF ¶ 111; Casella Dep. 144:6-9; Casella Decl. ¶ 11.)  King implied

that she was not so forward and direct as Casella was perceived. (Resp. SMF ¶ 112; Casella Dep. 144:6-9; Casella Decl. ¶ 12.)

After speaking with King, Casella also asked Cunningham where she came up short during her CRM interview and what she could have done differently. (SMF ¶ 113; Resp. SMF ¶ 113; SAMF ¶ 50.) According to Casella, Cunningham told her that she was overly cocky and arrogant and that she reminded him of himself. (SMF ¶ 114; Resp. SMF ¶ 114; SAMF ¶ 51.) Cunningham advised her, according to Casella, that the next time she should not put herself out there as being so aggressive, to try to back herself down,  and not to come out so strong.   (SMF ¶ 115; Resp. SMF ¶ 115; SAMF ¶ 51.) [26]

Casella relates that after her conversations with Lenox, King, and Cunningham about her non-selection, Casella was "about 60 percent" sure that she had been discriminated against on the basis of her sex.  (SAMF ¶ 78; Casella Dep. at 145:15-24.) [27]

### K. Casella Discussed the CRM Position with Joyce McPhetres

The Myers-Briggs test is one of the instruments that can be used by businesses and organizations, including the Bank, to help individuals understand themselves and their preferences better and to aid in their professional development.  (SMF ¶ 125; Resp. SMF ¶ 125; McPhetres Dep. at 63-64, 75, 77.)  Joyce McPhetres, the Director of Education and Development, attended a week-long training in Delaware on the Myers-Briggs' instrument and administered a Myers-Briggs' class for the Bank in Belfast. (SMF ¶ 126; Resp. SMF ¶ 126.)

---

[26]       This is not the only instance that the defendants deny an additional statement of fact that is identical to their own statement of fact.  (Compare SMF ¶¶ 113, 114, 115 with Resp. SAMF ¶¶ 50. 51.) In responding to Casella's Paragraph 50 the defendants maintain that Cunningham has no recollection of speaking with Casella after the interview process. (Resp. SAMF ¶ 50; Cunningham Dep. at 61-62.)

[27]       Pointing out that this statement is principally a legal conclusion, the defendants reiterate that Lenox does not recall giving Casella any feedback about her interview, nor was it his habit to speak with applicants after the interview process; (Resp. SAMF ¶ 78; Lenox Dep. at 132:21-23, 133:3-6);   King has no recollection of what he and Casella discussed after she was turned down from the CRM position (Resp. SAMF ¶ 78; King Dep. at 58:2-12);  and Cunningham has no recollection of speaking with Casella after the interview process (Resp. SAMF ¶ 78; Cunningham Dep. at 61:23-62:1).

McPhetres, who met with Casella roughly once a week (although not one-on-one) as part of the People Development Program (PDP)[28], was supportive of her. (SMF ¶ 130; Resp. SMF ¶¶ 130, 131.)  According to Casella, on October 25, 2005, during a one-on-one conversation with McPhetres to check in to see how Casella was doing with the PDP (SAMF ¶ 70; Resp. ¶ 70), Casella brought up the CRM Program and what Lenox, King, and Cunningham had said to her (SMF ¶ 131; Resp. SMF ¶ 131; SAMF ¶ 71; Resp. SAMF ¶ 71).   The defendants insist that in this meeting Casella did not identify who had the opinion that Casella was too aggressive, unapproachable, or too cocky and that Casella agreed that she conceded to McPhetres that she was in fact too aggressive and unapproachable.   (Resp. SAMF ¶ 71; McPhetres Dep. at 62-67.) According to Casella, McPhetres responded that being a strong woman is not looked upon kindly by the Bank, and if Casella were a man it would be no problem, but because she was a woman she needed to be softer and kinder. (SMF ¶ 132; Resp. SMF ¶ 132.)   During the conversation, according to Casella, McPhetres went through a timeline of women in business: how in the 80's women were supposed to be aggressive and direct -- right out there -- in a male corporate world; in the 90's it was expected that you started to calm back down because there were more woman in the workplace and in corporate positions; but today women were actually looked upon as mothers and needed to be softer, kinder, and more motherly. (SMF ¶ 133; Resp. SMF ¶ 133; SAMF ¶ 72; Resp. SAMF ¶ 72.)[29]  McPhetres also suggested that Casella take the Myers-Briggs' instrument, according to Casella, so that she can look at her personality and see what she could do to change her personality and to get it in line with what the Bank expects of a female manager, to be more motherly and soft.   (SMF ¶ 134; Resp. SMF ¶ 134; SAMF ¶ 73.)   The defendants respond that McPhetres asked Casella is if she would like to take the Myers-Briggs

---

[28]      See infra note 34.
[29]      Although it propounded Paragraph 133 as Casella's version of events, the defendants deny that McPhetres had any discussion with Casella.  (Resp. SAMF ¶ 72; McPhetres Dep. at 68-70.)

instrument because Casella said she wanted to continue to grow and understand herself better. (Rep. SAMF ¶¶ 73, 75; McPhetres Dep. at 79:11-17.)  They insist that the Myers-Briggs is not used to change one's personality and McPhetres never told Casella that she needed to change her personality or that she needed to conform to MBNA's expectations. (Resp. SAMF ¶¶  73,75, 79; McPhetres Dep. at 80:1-3, 92:22-93:7.)[30]

Casella was upset by McPhetres' statement that Casella ought to get her personality more in line with what MBNA expected of a female manger, but she felt that McPhetres was trying to help her career. (SMF ¶ 135; Resp. SMF ¶ 135; Casella Dep. at 152-153; SAMF ¶ 74.)[31]  Casella felt humiliated after speaking to McPhetres.  (SAMF ¶ 81; Casella Dep. at 156:25-157:12.)[32]

According to Casella, she subsequently related to King that she believed that McPhetres wanted her to take the Myers-Briggs test so that she could work on her personality and alter it to conform with MBNA's expectations for a female manager. (SAMF ¶ 75; Casella Dep. 155:2-10.) King responded that he thought that was a great idea and that it probably would help Casella in the future. (SAMF ¶ 76; Casella Dep. 155:2-10.)  King has no recollection of ever discussing the Myers-Briggs with Casella.  (Resp. SAMF ¶¶ 75, 76; King Dep. at 77:16-24.)  King has never suggested to an employee that they take the Myers-Briggs nor would he ever suggest to Casella

---

[30]    The defendants insist that the Myers-Briggs instrument was not intended to change an individual, but rather to understand their preferences.  (SMF ¶ 127; McPhetres Dep. at 80.)  Casella responds that McPhetres testified that the Myers-Briggs instrument is used in varying ways. (Resp. SMF ¶¶ 125, 127; McPhetres Dep. 80:18.) Although she claimed at her deposition that at the Bank the instrument was not intended to change an individual, McPhetres suggested to Casella that she take the assessment to alter her personality and conform it to MBNA's expectations of female managers. (Resp. SMF ¶¶ 125, 127; Casella Dep. 152:14-23.)  King and Cunningham (he thinks) took the Myers-Briggs' instrument as part of leadership or management development classes at the Bank.  (SMF ¶ 128; Resp. SMF ¶ 128.)

[31]    Casella is correct that the cited testimony does not support the defendants' claim that Casella did not feel like this advice was discriminatory. Once again the defendants insist that McPhetres did not tell Casella that she had to get her personality in line.  (Resp. SAMF ¶ 74; McPhetres Dep. at 69-70, 92-93.)

[32]    The defendants respond that Casella's testimony is that she did not take the Myers-Briggs test because she found it humiliating. (Resp. SAMF ¶ 81; Casella Dep. at 157:6-11.)  As there is no dispute that the crux of this conversation was about the test, the phrasing of Casella's statement of fact is not inappropriate and, even if the court were to limit it to the defendants' variation, my recommendation on this motion would not be altered.

that she take it. (Resp. SAMF ¶ 76; King Dep. at 91:24-92:4.)  Casella's direct supervisor, Alan

Camire, also supported the idea.  (SAMF ¶ 77; Resp. SAMF ¶ 77.)

According to Casella, McPhetres's comments and her suggestion that Casella change her

personality were the "final straw" that caused Casella to conclude that the comments that she

was arrogant, cocky and aggressive were related to her gender and that she had not been selected

for the CRM Program because she did not fit MBNA's stereotype of how a woman should act.

(SAMF ¶ 79;  Casella Dep. at 92:15-93:3, 140:10-16, 156:25-157:5.)  Casella informed

managers Joyce McPhetres, Tammy Wagonknecht, Brian King and Dave Dassoni that she felt

she was being discriminated against. (SAMF ¶ 80; Casella Dep. at 80:9-15.)[33]  There is no

dispute that McPhetres had no involvement in the selection process for the CRM Program and

does not know Lenox. (SMF ¶ 136; Resp. SMF ¶ 136.)

**L. Casella Resigns on February 8, 2006[34]**

According to the defendants, prior to Casella's conversation with McPhetres on October

25, 2005, she was being treated for emotional distress, including the traumatic event of her seven

year old daughter being sexually molested  and Casella was prescribed Prozac and Xanax. (SMF

¶ 137; Casella Dep. at 86-89; id. Ex. 8.)  Casella points out that she discussed this situation with

her primary care physician one year before her meeting with McPhetres and, at the same time,

met with a family counselor.  (Resp. SMF ¶ 137; Casella Dep. at 86-89; Casella Decl. ¶ 14.)

The defendants assert that after the conversation with McPhetres, on October 28, 2005,

Casella's supervisor was going over a recorded call that Casella had with a customer and she

---

[33]    The defendants respond that McPhetres testified Casella never mentioned to her that she felt the company
was discriminating against her in any fashion. (Resp. SAMF ¶ 80; McPhetres Dep. at 92:12-16.)

[34]    In this summary of facts I have omitted the to-and-fro concerning Casella's selection and participation in
the "People Development Program" after her non-selection for the CRM program and prior to her resignation. (SMF
¶¶ 116, 117, 118, 119. 120, 121. 122, 123, 124, 129; Resp. SMF ¶¶ 116, 117, 118, 119, 120, 121, 122, 123, 124,
129; SAMF ¶¶ 63, 65, 66, 68, 69;  Resp. SAMF ¶¶ 63,64,65, 66, 67, 69.)  These facts are principally material to the
merits of Casella's constructive discharge claim and I do not reach the merits of that claim in this recommended
decision.

snapped at him after he said she had falsified a bank document. (SMF ¶ 138; Casella Dep. at 105, 196-97, id. Ex. 9.)[35]   Casella responds that her testimony was that by the use of the word "snapped" she meant "broke out in tears."  (Resp. SMF ¶ 138; Casella Dep. at 197: 24-25; SAMF ¶ 82.)   Due to stress Casella went home with the permission of her direct supervisor, Alan Camire. (SAMF ¶ 83; Casella Dep. at 92:6-14, 198: 16-20.)[36]

There is no dispute that Casella later reported to her treating therapist, Dr. Karen Kelley, that on October 28, 2005, she snapped at work -- after making a mistake -- and lost control. (SMF ¶ 139; Resp. SMF ¶ 139.)   Casella missed several days of work because of stress related to her employment at the Bank and not receiving the CRM position three months earlier, and sought treatment with her physician, Dr. Kim Peterson, on October 31, 2005.  (SMF ¶ 140; Casella Dep. at 91-93, id. Ex. 8; SAMF ¶ 84; Resp. SAMF ¶ 84.) Dr. Peterson took Casella out of work.  (SAMF ¶ 86; Resp. SAMF ¶ 86.)   Dr. Peterson's notes state, "She has filed suit against MBNA for sexual discrimination. She has not been able to work for 4 days due to crying when she tries to go."  (SAMF ¶ 85' Resp. SAMF ¶ 85.)

 Dr. Peterson recommended that Casella be approved for short-term disability from October 28, 2005, through November 29, 2005, for stress and depression related to her not being selected for the CRM Program. (SMF ¶ 141; Resp. SMF ¶ 141.)  On November 28, 2005, Dr. Peterson submitted to the bank a progress note updating Casella's condition, stating that she was

---

[35]     The defendants respond to Casella's Paragraph 82, by claiming that there is nothing in her record citations to support the assertion that this event happened on October 28, 2005.  (Resp. SAMF ¶ 82.)  Apparently the defendants did not bother to consider their own statement of fact.   They also add that Casella and Camire were reviewing recorded calls and that the mistake that was pointed out to Casella had happened over the past month. (Resp. SAMF ¶ 82; Casella Dep. at 198:14-22.)

[36]     The defendants maintain that Casella's citations do not fully support her assertion.  (Resp. SAMF ¶ 83.) They opine:

> The citation to Casella Dep. at 92:6-14 discusses her doctor's notation that she has been out of work for four days because Plaintiff says she was crying and was experiencing anxiety attacks. Plaintiff's citation to Casella Dep. at 198:14-22 supports only that "he" allowed her to take leave. Camire was Plaintiff's supervisor during the time she was on short-term leave, Casella Dep. at 76:1-10, her doctor would have diagnosed her condition.

(Id.) I am not sure what the defendants hope to gain by advancing this qualification.

treating with Dr. Kelley and that she should be out of work until early January 2006.  (SMF ¶ 142; Resp. SMF ¶ 142.)  Dr. Kelley's progress note of December 22, 2005, provided that Casella lost her cousin in a fire causing her emotional distress and she did not want to return to work because she was worried she might say something inappropriate. (SMF ¶ 143; Casella Dep. at 107, id. Ex. 9 (P00670).)[37]  Casella objects to the implication that the two events  -- the house fire and the incident at work – are linked, maintaining that the note does not support such a contention. (Resp. SMF ¶ 143.)

There is no dispute that Dr. Peterson recommended to the Bank that Casella remain out of work through January 19, 2006. (SMF ¶ 144; Resp. SMF ¶ 144; SAMF ¶ 87; Resp. SAMF ¶ 87.) The Bank approved her paid short-term disability leaves. (SMF ¶ 145; Resp. SMF ¶ 145.)

During this period Casella experienced fatigue, a gastric issue caused by stress, could not keep down food, went to therapy, cried a lot, and was very sick. (SAMF ¶ 88;Casella Dep. at 170:11-15, 172:6-9.)   The defendants add that Casella also testified that she was active during this period, volunteering at her children's' schools, socializing at basketball games, going out to dinner with her husband, seeing friends, and traveling to New York to her cousin's funeral. (Resp. SAMF ¶ 88; Casella Dep. at 174:10 – 175:17.)

Casella was released to return to work by Dr. Peterson on January 20, 2006. (SMF ¶ 146; Resp. SMF ¶ 146; SAMF ¶ 89; Resp. SAMF ¶ 89.) The Bank permitted Casella to return to work on a part-time basis, three days a week, six hours per day. (SMF ¶ 147; Resp. SMF ¶ 147; SAMF ¶¶ 89, 90; Resp. SAMF ¶¶ 89, 90.)

---

[37]     With respect to the submissions in support of their statement of facts, the defendants have not filed Exhibit 9 to the Casella Deposition.  (See Doc. No. 32.) There are no exhibits attached to the portions of the Casella Deposition submitted by Casella (see Doc. No. 49) nor are there exhibits attached to the portions of the Casella Deposition filed by the defendants vis-à-vis their reply (see Doc. No. 62).  I have been unable to locate the intended exhibit in the electronic docket.

Despite the reduced hours, Casella found upon her return that working for the Bank was intolerable.  She reports: "I walked in the door and my skin crawled." (SAMF ¶ 91; Casella Dep. 177:19 -22.)[38]  Even with her part-time schedule, Casella missed a lot of work due to her belief that she had been discriminated against. (SAMF ¶ 92; Casella Dep. 182:21-184:15; Casella Decl. ¶ 15; Casella Dep. Ex. 19.)  The defendants stress that Casella had been released by her doctor to return to work.  (Resp. SAMF ¶ 91)  They note that she also missed work due to her child's or children's illnesses.  (Resp. SAMF ¶ 92.)   She left two hours early on January 20, did not work January 25 through January 27, took four hours of personal time on January 30, worked only two hours on February 1, called out February 2, and called out February 3. (SAMF ¶ 93; Casella Dep. at 183:6-184:15; Casella Dep. Ex. 19.)  The defendants note that King allowed/preapproved Casella's reduced work schedule.  (Resp. SAMF ¶ 93.)

Between January 20, 2006, when Casella returned to work, and the day she resigned, February 8, 2006, there were no further incidents of discrimination and nobody did anything further that made working at the Bank intolerable. (SMF ¶ 148; Resp. SMF ¶ 148; Resp. SAMF ¶ 91.)

On the days leading up to her resignation, Casella worked on February 6 and 7, 2006, but left early because her daughter was sick. (SMF ¶ 149; Resp. SMF ¶ 149; Casella Dep. at 164; id. Ex. 19.)[39]  Casella resigned her position on February 8, 2006 (SAMF ¶ 1; Resp. SAMF ¶ 1) -- seven months after not receiving the CRM position -- claiming that working at the Bank was intolerable and she was forced to resign.  (SMF ¶ 150; Resp. SMF ¶ 150.)  By February 8, 2006,

---

[38]     The defendants request that this statement be stricken because it is part subjective opinion, part legal conclusion.  (Resp. SMF ¶ 91.) I am not sure what part of this statement it considers a legal conclusion and Casella's subjective experience is material to her constructive discharge theory (even though I do not reach the merits of that claim).

[39]     Casella points out that it is not clear from Casella Ex. 19 if she worked at all on February 7, 2006; her daughter was sick on that date.  (Resp. SMF ¶ 149.)  This question is not outcome determinative.

Casella had reached the conclusion that she could not possibly work another day. (SAMF ¶ 94; Casella Dep. at 179:5-7; Resp. SAMF ¶ 94.)[40]  She felt she had no other choice than to resign. (SAMF ¶ 95; Casella Dep. at 179:5-22, 183:6- 184:15.)  From October 28, 2005, through January 20, 2006, Casella was unable to work due her devastation at believing that her career was over and that she would never be able to succeed at the Bank unless she completely altered her personality to conform to the Bank's stereotypical norms.  (SAMF ¶ 96; Casella Decl. ¶ 15-18.)[41]

Casella did not complete the PDP.  (SMF ¶ 151; Resp. SMF ¶ 151.)   The defendants represent that Casella acknowledges that if she did not resign her position she could have stayed on and possibly become a manager.  (SMF ¶ 151, citing Casella Dep. at 186.)[42]  Casella denies that if she had stayed on and not resigned that she possibly could have become a manager because that would have necessitated altering her basic personality to conform to something she was not.  (Resp. SMF ¶ 151; Casella Dep. at 178:13-18.)

**M. Casella's Evidence of Gender Discrimination and EEOC Charge**

After the conversation with King in July 2005, Casella began feeling that she was not selected for the CRM position because of discrimination due to her gender. (SMF ¶ 152; Resp. SMF ¶¶ 152, 153.)  Casella was aware that the stated policy of the bank did not tolerate any form of discrimination or harassment and that any complaint of discrimination would be promptly and thoroughly investigated by the bank's personnel department.  (SMF ¶ 153; Resp. SMF ¶ 152;

---

[40]       The defendants argue that the record evidence does not support more than the conclusion that Casella reached this conclusion by February 2006. (Resp. SAMF ¶ 94.)  It does not take too great a leap to conclude that this decision was made by February 8, 2006, the date of her resignation.

[41]       The defendants reiterate that Casella informed her physician on December 22, 2005, that she lost her cousin in a fire, causing her emotional distress, and that she did not want to return to work because she was worried she might say something inappropriate. (Rest. SAMF ¶ 96; Casella Dep. at 107; id. Ex. 9.) The defendants contend that Casella's Paragraphs 95 and 96 are not fact and should be stricken. (Resp. SAMF ¶¶ 95, 96.)  I deny this request.

[42]       The defendants have not filed page 186 as part of Doc. No. 32, it is not part of Casella's Doc. No. 49, and is not part of the Casella Deposition filed as part of its reply, Doc. No. 62.

Casella Dep. at 80.)[43]   According to the defendants, Casella did not inform personnel of her

concerns. (SMF ¶ 154; Casella Dep. at 80.)  Casella responds that she adequately apprised

Lenox, Cunningham, King, and McPhetres of her concerns.  (Resp. SMF ¶ 154.)

During her tenure with the bank, Casella had two female managers – Karen Savage and

Tammy Wagonknecht -- and the director of her department at the time she applied for the CRM

Program was a female. (SMF ¶ 155; Resp. SMF ¶ 155; Casella Dep. at 52.) Based on Casella's

"visual observation," she maintains that most of the work force was female, though males tended

to fill management roles. (SMF ¶ 156; Resp. SMF ¶ 156.)  The Defendants argue that Casella

bases her belief that candidates were predominantly female, though males filled more

management roles, *only* on her visual observations. (Resp. SAMF ¶ 52; Casella Dep. at 51:16-24,

52:21-23; Resp. SAMF ¶ 97.)

On or about March 14, 2006, after her resignation, Casella dually filed a charge with the

Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity

Commission alleging sex discrimination. (SMF ¶ 157; Resp. SMF ¶ 157.)  The charge alleges

that the bank discriminated against her based on her gender when the bank did not select her for

the CRM Program. (SMF ¶ 158; Resp. SMF ¶ 158.)  The single date of discrimination listed in

the charge was October 25, 2005. (SMF ¶ 159; Resp. SMF ¶ 159; Casella Dep. Ex. 4 at 1.)

Casella's charge and her attorney's position letter to the MHRC dated June 26, 2006, make no

mention of constructive discharge, her resignation, nor is there any language in the charge or the

letter challenging her termination. (SMF ¶ 160; Resp. SMF ¶ 160.)  Casella asserts that the basis

of Casella' s constructive discharge claim were discussed at the fact-finding session conducted

by the Investigator for the Maine Human Rights Commission on or about December 21, 2006. At

---

[43]      Casella maintains that her interactions with Lenox, Cunningham, King, and McPhetres tell a different story.
(Resp. SMF ¶ 152.)

the fact-finding, as set forth in the Investigator's notes, Casella stated that she had resigned because she emotionally could not handle returning to MBNA due to the basis of her denial for the CRM position. The investigator's draft report expressly states that Casella ostensibly "voluntarily left" and "resigned." (SAMF ¶ 100; Young Decl. ¶ 6.)[44] Per the defendants all the Investigator notes suggest is that Casella told the investigator the date she resigned and how she felt when she returned after leave. (Resp. SAMF ¶ 100; Young Decl. Ex. E.) Excerpts from the undated, unsigned "Draft" report only state that "Ms. Casella resigned on February 8, 2006." (Resp. SAMF ¶ 100; Young Decl. Ex D). On the first page of the "Draft" report the MHRC outlined Casella's charge, and nothing is mentioned about "constructive discharge": "Ms. Billie Casella alleges that she was discriminated against in employment by MBNA and denied the CRM position because she is female and does not conform to MBNA's stereotype of how a woman should act."  (Resp. SAMF ¶ 100.)

### III.    Legal Analysis

Count I of Casella's amended complaint alleges that the MBNA subjected Casella to discrimination based upon her sex by knowingly denying her the CRM position because she is female and she did not conform to MBNA's stereotype of how a woman should act (Am. Compl. ¶ 33) in violation of  Title VII (id. ¶ 44).  Count II alleges that BOA subjected Casella to discrimination based upon her sex by knowingly denying her the CRM position because she is female and she did not conform to BOA's managers' stereotype of how a woman should act (id.

---

[44]      It is the defendants' position that the unauthenticated MHRC Investigator notes and the excerpts from the unsigned "Draft" report, introduced through Casella's citation to the Declaration of Jeffrey Neil Young at ¶ 6, should be stricken.  (Resp. SAMF ¶ 100.)  Apparently in response to this contention but without explanation to the court, on June 4, 2009, Casella filed an affidavit of Michele Dion averring that she was the investigator responsible for the draft report and the attached handwritten notes.  (Doc. No. 68.)   The defendants have filed an objection to this late-filed affidavit.  (Docket No. 69.)  My recommendation on the issue of whether or not Casella exhausted her constructive discharge claim assumes, for summary judgment purposes, the admissibility of this report and notes.

¶ 37) in violation of Title VII (id. ¶ 38). The amended complaint makes no mention of a claim of "constructive discharge."[45]

### A.  Failure to Promote[46]

In her response to the motion for summary judgment Casella "asserts both mixed motive and intentional discrimination." (Resp. Mot. Summ. J. at 10.)    With regards to her theory that she is the victim of sex-based stereotyping, the First Circuit reflected in Chadwick:

> The type of discrimination Chadwick alleges involves stereotyping based on sex. The Supreme Court identified sex-based stereotyping as an impermissible form of discrimination in Price Waterhouse. There, a woman was denied partnership at the accounting firm for which she worked and was told by the partnership that she was too aggressive and macho, should attend a charm school, and should dress and behave more femininely. Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989). The Supreme Court held that such remarks were evidence of sex-based stereotyping, which in turn suggested that sex discrimination was the cause of the failure to promote. Id. at 251. The Court pointedly said, "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." Id.
> ….
>
> …Chadwick presses her claim under two separate, though related, theories. She puts forth a "mixed motives" claim, under Desert Palace, Inc. v. Costa, 539 U.S. 90  (2003), and a traditional discrimination claim under the familiar McDonnell Douglas burden shifting scheme. Our decision here, however, is not dependent on analyzing Chadwick's claim under each of these theories, because under both approaches, "plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." Hillstrom, 354 F.3d at 31 (discussing the "interaction between Desert Palace and McDonnell Douglas ").

---

[45]    The defendants note that the complaint does not seem to allege such a claim but address it  "out of an abundance of caution" because Casella suggested during her deposition testimony that she was actually raising such a claim.  (Mot. Summ. J. at 8 n.5.)

[46]    For purposes of this motion for summary judgment the defendants concede that the CRM Program selection qualifies as a promotion for purposes of this Title VII analysis. (Mot. Summ. J. at 15 n. 10.)  The defendants define CRMs as "super reps" who could cover various associate positions as the need arose.  While the defendants take trouble to insist there were other paths to management, there is no dispute that the program was selective, being for "top performers," and Casella has produced evidence that the program was a productive option to exercise in this respect.

561 F.3d at 44 -45 (emphasis added) (footnotes omitted).  See White v. Baxter Healthcare Corp.,

533 F.3d 381, 401 (6th Cir. 2008) (setting forth extensive analysis of inter-Circuit law concerning

the application of  the McDonnell Douglas/Burdine burden-shifting framework to the summary

judgment analysis apropos Title VII mixed-motive claims in view of Desert Palace); Chadwick,

561 F.3d at 45 n. 8 ("The Desert Palace decision has proved ripe terrain for scholarly debate over

how that decision interacts with the McDonnell Douglas framework. See, e.g., Jamie Darin

Prenkert, "The Role of Second-Order Uniformity in Disparate Treatment Law: McDonnell

Douglas's Longevity and the Mixed-Motives Mess," 45 Am. Bus. L.J. 511, 512-15 (2008)

(collecting commentaries). Suffice it to say that the two decisions have not been definitively

disentangled or reconciled…"); Chadwick v. Wellpoint, 550 F.Supp.2d 140, 144-45 (D.Me.

2008) ("The parties devote much of their legal arguments to how to apply McDonnell Douglas,

pretext, [Desert Palace v.]Costa, and mixed motive analysis to the facts here. But whatever the

plaintiff's theory of the case, in the final analysis she must have enough evidence, direct or

circumstantial, to go to a jury, from which that jury could conclude that her supervisors

considered her caregiving role as a female in their decision not to promote her (whether or not

her sex ultimately made the difference)") (footnotes omitted, citing Rodriguez-Cuervos v. Wal-

Mart Stores, Inc., 181 F.3d 15, 22 n. 5 (1st Cir.1999)); see also Filter Specialists, Inc. v. Brooks,

__ N. Ed. 2d __, __, 2009 WL 1444195, 3  (Ind.  May 21, 2009).

      This case and the summary judgment record is strikingly similar to Chadwick (with the

Price Waterhouse overlay) right down to the looming question of what the legal standards are

with regards to a direct discrimination claim as opposed to a mixed motive claim of sex-based

stereotyping.  I can see no reason why this Court should go beyond what the First Circuit did in

Chadwick by wading into the Desert Palace, Inc./McDonnell Douglas quagmire that the

Chadwick panel admittedly left wet and boggy.  That is, because of the dimensions of this case, this Court need only inquire whether Casella presents "enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias."  And, while the defendants persist in insisting that Casella needs to have direct evidence of discriminatory animus to survive this motion for summary judgment, see supra note 3, Chadwick  expressly rejected the argument that a plaintiff must have direct evidence of discrimination to survive summary judgment as such an onus, the Panel opined "would undermine the concept of proof by circumstantial evidence, and would make it exceedingly difficult to prove most sex discrimination cases today."  561 F.3d at 46.

It is easy to summarize some of the salient evidence advanced by Casella on this score. She has created a genuine dispute of fact as to the following.  Between her hiring in November 2003 and the application process for the CRM position in July 2005, she received the January 2004 promotion to Customer Marketing Account Review Analyst; in April 2004, Casella was promoted and relocated to the Bank's call center in Belfast; in October 2004 Casella was promoted to the Customer Assistance Department; in Belfast, she received promotions to two other departments, Customer Marketing and Balance Retention; and MBNA then appointed her to a special Customer Marketing Task Force from April to June 2005.  When she applied for the CRM position her last two performance appraisals were "Excellent" (October 29, 2004) and "Exceeds Expectations" (April 28, 2005).   With respect to the CRM Program Casella received the required endorsement from two Directors, Jeff Nathan and Susan Howland.  In Casella's twenty-seven month tenure with the Bank, her annual salary increased 30.1%.

Prior to the application process, Karen Savage, Casella's direct supervisor in 2005, spoke to her about communication problems she had with a customer and Tammy Wagonknecht and another supervisor spoke to her about being intimidating, her aggressiveness, and her approachability as an associate.

With regards to the interview process itself, there is no dispute that the candidates' interview performance -- their verbal and communication skills, how they responded to questions and their ability to articulate, and their personality and demeanor -- was the determining factor in the selection process.   In terms of the analysis of Casella's interview performance, Cunningham's sheet noted as a weakness that Casella needed to "balance confidence with approachability."  Lenox responded to Casella's post-interview inquiries about her prospect of getting one of the positions by indicating that Casella scared him, that she seemed to be very aggressive, and that she came off as very strong.

As for Casella's CRM application-related conversations after the interview, according to Casella, a few weeks after learning that she was not selected for the CRM Program, Casella approached King and he informed her "off the record" that he was tired of hearing that she was cocky, arrogant and aggressive and she needed to learn to temper herself down.  King advised her that she needed to become softer, more motherly and that it was acceptable if she were a man, but it was not acceptable from a woman and they needed to address it.  King also advised Casella that she should change mentors, and find someone softer but still very successful. Cunningham told her that she was overly cocky and arrogant and that she reminded him of himself.  Cunningham advised her, according to Casella, that the next time she should not put herself out there as being so aggressive, to try to back herself down and not to come out so strong.

44

And then there is the conversation that Casella reports she had with McPhetres, who admittedly had no role in the CRM selection process. McPhetres told Casella that being a strong woman is not looked upon kindly by the Bank and if Casella were a man it would be no problem, but because she was a woman she needed to be softer and kinder. McPhetres went through a timeline of women in business: how in the 80's women were supposed to be aggressive and direct -- right out there -- in a male corporate world; in the 90's it was expected that you started to calm back down because there were more woman in the workplace and in corporate positions; but today women were actually looked upon as mothers and needed to be softer, kinder, and more motherly. McPhetres also suggested that Casella take the Myers-Briggs' instrument, according to Casella, so that she can look at her personality and see what she could do to change her personality and to get it in line with what the Bank expects of a female manager, to be more motherly and soft. According to Casella, she subsequently related to King that she believed that McPhetres wanted her to take the Myers-Briggs test so that she could work on her personality and alter it to conform with MBNA's expectations for a female manager and King responded that he thought that was a great idea and that it probably would help Casella in the future.

Casella stresses that the number of candidates to be selected for the CRM Program was not fixed and the defendants concede that with regards to CRM postings in other regions, there were instances in which more CRM candidates might be selected than targeted if there were additional outstanding candidates. Casella also points out that with respect to those candidates with an interview score of "2" the breakdown was 6 females to two males and with regards to those with an interview score of "3" the numbers were 3 females to 2 male candidates. The management team selected ten females and ten males for the CRM Program; 10 of 14 men, or 71.43%, compared to 10 of 19 women, or 52.63%. Also, of the 20 candidates accepted in the

CRM Program, seven men and only two women were promoted to management positions before the completion of the Program.[47]  Prior to the interviews, Casella was ranked 12th of 22 candidates from Retention.   All 11 candidates ranked higher than Casella were selected; in addition, 5 of the 10 candidates ranked *lower* than Casella, including the 3 immediately below her, as well as the nineteenth and twentieth candidates, were accepted.   Three of the four males ranked lower than Casella in Retention were chosen.[48]

The Chadwick Panel cautioned that "at summary judgment [the Court does] not decide which explanation for the non-promotion is most convincing, but only whether [the plaintiff] has presented sufficient evidence regarding [his or] her explanation."  561 F.3d at 47 n. 11 (citing Thomas, 183 F.3d at 61.)  Casella has.  That is, "a reasonable jury could conclude that the promotion denial was more probably than not caused by discrimination," a conclusion that is not an estimation of "the ultimate balance of the evidence in this case." Id. at 48.

### B.  Constructive Discharge

In the motion for summary judgment the defendants maintain that Casella cannot press her claim for constructive discharge because she did not exhaust her administrative remedies on this theory.  (Mot. Summ. J. at 8.) They insist: "A constructive discharge is a discrete instance of discrimination, thus requiring an independent complaint and subsequent inquiry by an administrative agency in order to establish exhaustion of administrative remedies."  (Id. at 8-9.) Along with a reliance on the generalized discussion of administrative exhaustion in Franceschi v. United States Department of Veterans Affairs, 514 F.3d 81, 85 (1st Cir. 2008), they cite

---

[47]     I recognize that Casella does not have the numbers to set these figures in the context of  the male versus female make-up of the entire workforce from which CRM candidates were selected.

[48]     The defendants persistently insist that the final decision was made based on the interview and they were looking for the best qualified candidates.  This insistence cuts both ways because in terms of company culture and the impact of ingrained corporate stereotypes the jury could conclude that this emphasis on the interview over the pre-interview ranking was one mechanism for the Bank to weed out employees that did not meet the company's stereotype of how women should behave in its workplace.

Rodriguez v. USPS, No. 88-1299, 1989 WL 57158, *1 (D. P.R. May 16, 1989) and Erbel v.

Johanns, No.-CV-555, 2007 WL 1387331, *13 (E.D. Tenn. May 8, 2007) for the specific issue

of exhausting discrete constructive discharge claims.

In her response to the motion for summary judgment, Casella cites to Paragraph 100 of

her Statement of Additional Facts (Resp. Mot. Summ. J. at 23) which reads:

> The bases of Casella's constructive discharge claim were discussed at the fact
> finding conducted by the Investigator for the Maine Human Rights Commission
> on or about December 21, 2006. At the fact finding, as set forth in the
> Investigator's notes, Casella stated that she had resigned because she emotionally
> could not handle returning to MBNA due to the basis of her denial for the CRM
> position. The investigator's draft report expressly states that Casella ostensibly
> "voluntarily left" and "resigned." See Young Decl. ¶ 6.

(SAMF ¶ 100.)   Paragraph 6 of the Young Declaration/Affidavit reads:

> The bases of Casella's constructive discharge claim were discussed at the fact
> finding conducted by the Investigator for the Maine Human Rights Commission
> on or about December 21, 2006. Attached hereto as Exhibit D are the
> Investigator's notes showing that Casella resigned because she emotionally could
> not handle returning to MBNA due to the basis of her denial for the CRM
> position. The statements include:
> · I emotionally couldn't even handle being in bldg.;
> · I couldn't handle the basis upon which I had been denied a CRM
> position;
> · I worked very hard to get promotions and I had done everything I could
> do to move ahead and achieve my goals within the company;
> · What do I need to do to improve myself so that I can get one of these
> positions;
> · It felt at that point that it was no use even trying;
> · When I came back in January 2006, I was ready to apply myself and go
> back to work;
> · I couldn't bring pieces back together. Found my therapist thru EAP;
> · I walked back into bldg. and was in tears;
> · The harder I tried, the harder it became;
> · I came back to customer retention;
> · It was hard;
> · I felt horrible in my environment at that time;
> · I just couldn't make it work for myself again.
> Moreover, although the Investigator never issued a report because she concluded
> that the charge was untimely for purposes of Casella's state claims, her draft
> report expressly states that Casella ostensibly "voluntarily left" and "resigned" her

employment with MBNA. Attached hereto as Exhibit E are these excerpts from the Investigator's draft Report (Bates P00198, P00199, and P00204.)

(Young Decl. ¶ 6.)

In their reply brief the defendants counter:

Casella has not established that she exhausted her administrative remedies with respect to her constructive discharge claim. Her attempt to do so offers inadmissible hearsay and unauthenticated documents, namely, notes taken by the MHRC Investigator and excerpts from the Investigator's unsigned "Draft" report. However, it is well established that courts may not consider inadmissible hearsay or unauthenticated documents for purposes of summary judgment. Fajardo Shopping Ctr. v. Sun Alliance Ins., 167 F.3d 1 (1st Cir. 1999) (evidence that is inadmissible at trial may not be considered on summary judgment); Roy v. Runyon, 954 F. Supp. 368, 374 (D. Me. 1997) (to be admissible on summary judgment, documents must be authenticated by an affiant whom the exhibits could be admitted into evidence). Thus, the unauthenticated MHRC Investigator notes and the excerpts from the unsigned "Draft" report should be stricken. Stolarczyk v. Senator Int'l Freight Forwarding, L.L.C., 376 F. Supp. 2d 834, 838-40 (N.D. Ill. 2005) (striking for summary judgment purposes interview notes taken by EEOC investigator).
         Even if the Court does consider the Investigator's notes and the excerpts of the "Draft" report (which merely references that "Ms. Casella resigned on February 8, 2006" (Young Decl., Ex. D (P002040)), Casella has not established that she exhausted her administrative remedies. It is not the scope of the actual investigation pursued that determines what complaint may be filed, but what the EEOC investigation could reasonably be expected to "grow" from the original complaint. Powers v. Grinnell Corp., 915 F.2d 34, 39 n.4 (1st Cir. 1990) (citations omitted). The Notes (Young Decl., Ex. E) do not suggest that the MHRC Investigator asked questions about her resignation – but rather the notes only reflect the day she resigned and how she felt after she returned from leave. Regardless, whether or not the MHRC investigated, or asked Casella questions about the circumstances surrounding her resignation, does not establish that she exhausted her administrative remedies. A constructive discharge claim is a "distinct discriminatory act" that could not reasonably be expected to grow out of her claim that she was not promoted. Rodriguez v. United States Postal Service, 1989 WL 57158, at *1 (D. P.R. May 16, 1989) (citing Young v. Nat'l Center for Health Serv. Research, 828 F.2d 235, 238 (4th Cir. 1987)).

(Reply at 1-3) (footnotes omitted).

Casella's charge of discrimination (like the amended complaint) does not on the face of it

alert even a careful reader that she is complaining about a constructive discharge. The single date

of discrimination listed in the charge was October 25, 2005.  It gives a succinct summary of the

factual grounds for her claim of discrimination for not being promoted to the CRM position because she is "female and do not conform to MBNA's stereotype of how a woman should act." (Charge at 2, ¶ 12, Doc. No. 32-3.)  Its concluding 'particular' states: "I further believe that MBNA is engaged in a pattern and practice of discrimination against women with regard to promotions and filling management positions.  Accordingly, <u>this charge</u> is brought not only on behalf of myself, but also on behalf of all other females who have been denied management positions within the applicable statute of limitations."  (<u>id.</u> at 2, ¶ 13)(emphasis added).  Not only does the entire document speak of only the theory of non-promotion and a single charge -- without every referencing Casella's resignation -- Casella obviously did not envision that she was bringing "this charge" on a theory of constructive discharge "on behalf of all other females who [had] been denied management positions."  With respect to the MHRC draft report it summarizes Casella's charge: "Ms. Billie Casella alleges that she was discriminated against in employment by MBNA and denied the CRM position because she is female and does not conform to MBNA's stereotype of how a woman should act." (Draft Report at 1.)   Regarding the end of Casella's employment with the Bank, the draft report includes in the development of facts that "she voluntarily left the company on February 8, 2006" (<u>id.</u> at 2) and again notes that she "resigned on February 8, 2006" (<u>id.</u> at 3.  There is no suggesting that the investigator considered any of the bulleted items in Paragraph 6 of the Young Declaration as material to the charge.

    The defendants correctly point out that <u>Fantini v. Salem State College</u>, 557 F.3d 22 (1st Cir. 2009) is inapposite to the real focus of this exhaustion inquiry.  And my review of the applicable case law confronting this question (beyond the two unpublished opinions cited by the defendants)  suggests that the majority of the courts that have squarely addressed a similar

dispute soundly support the defendants' argument that Casella did not exhaust her constructive discharge claim. See, e.g., Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 n.2 (7th Cir. 2004); Ong v. Cleland, 642 F.2d 316, 320 (9th Cir. 1981);  Paris v. Southwestern Bell Telephone Co., 94 Fed.Appx. 810, 816, 2004 WL 790299, *5 (10th Cir. Apr. 14, 2004) (unpublished); Dixon v. Americall Group, Inc., 390 F.Supp.2d 788, 791 -92 (C.D. Ill. 2005); Lake v. Baker, 662 F.Supp. 392, 404  & n.9 (D. D.C. 1987); Jones v. Gates Corp., No. C98-73 MJM, 1999 WL 33656873, 9 -10 (N.D.Iowa Aug. 26, 1999)(unpublished); Mitchell v. Runyon, No. 94-CV-70084-DT, 1996 WL 633045, 5 -6  (E.D. Mich. Apr. 30, 1996) (unpublished) ; see also Erbel, 2007 WL 1387331 at 12 -13.[49]

### Conclusion

As explained above, my recommendation is that the Court deny the motion for summary judgment as to Casella's Title VII failure to promote claim and grant the motion as to her constructive discharge challenge.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 9, 2009

---

[49]     Should the Court disagree with this estimation, it would need to address the merits of the constructive discharge claim raised here by Casella.  I have left the pertinent facts in the factual summary above, with the exception of those paragraphs pertaining to the PDP referenced in note 34.